Filed 3/9/15  P. v. Nikolayan CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD NIKOLAYAN,<br><br>    Defendant and Appellant. | B249123<br><br>(Los Angeles County<br>Super. Ct. No. GA067198) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Darrell Mavis, Judge.  Affirmed with directions.

Mark J. Geragos, Geragos & Geragos for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Edward Nikolayan of kidnapping to commit rape (Pen. Code, § 209, subd. (b)(1))[1] (count 1), rape while the victim was intoxicated (§ 261, subd. (a)(3)) (count 3), sexual penetration while the victim was intoxicated (§ 289, subd. (c)) (count 4), and assault with intent to commit rape (§ 220) (count 5).

The trial court sentenced defendant to life in prison in count 1. In counts 3 and 4, the court imposed the high term of eight years, to run concurrently. In count 5, the court imposed a concurrent high term of six years and stayed the sentence under section 654.

Defendant appeals alleging ineffective assistance of counsel as well as trial-court error in limiting his right to confront and cross-examine the complaining witness and in denying a continuance for sentencing.

## FACTS

**Prosecution Evidence**

Shirley F. met a man who introduced himself to her as Tony as she was walking on the street. She had seen him park a car that was later identified as a black Dodge Magnum. Tony was later identified as Tigran Bedrosian. Bedrosian told Shirley he wanted to meet with her later to talk about a movie. She agreed to meet him at 6:00 p.m. at the Elephant Bar in Burbank, and she put his telephone number in her phone.

While Shirley waited for Bedrosian at the bar, she ordered something to eat and drink. Bedrosian arrived at approximately 6:30 p.m. with another man, later identified as defendant. Shirley was seated in between them at the bar. Bedrosian said defendant did not speak English. Bedrosian and defendant spoke Armenian, which Shirley recognized from past interaction with Armenians. Bedrosian ordered drinks for all three of them. As more drinks were ordered, Shirley consumed the drinks placed in front of her. All three of them went outside to smoke and re-entered the bar. Shirley had no memory of the events occurring shortly after they returned to the bar, which was at approximately 6:45 p.m.. The last thing Shirley remembered was Bedrosian saying something about making

---

[1] All further references to statutes are to the Penal Code unless stated otherwise.

"a porno" with her. She did not wish to do that and had not intended to have sex with Bedrosian or defendant.

Jessica Van Vliet, a bartender at the Elephant Bar, remembered Shirley and the two men. The three of them seemed friendly with each other, although not affectionate. Bedrosian paid the bill with his credit card at 7:39 p.m. The receipt listed seven glasses of wine and 11 shots of vodka. She did not see the party leave, but there was no commotion such as would have been caused by Shirley falling down or being carried out.

Shirley had planned to leave her meeting with Bedrosian at 7:00 p.m. and go to work. She was due to report at 8:00 p.m. She did not intend to go anywhere with Bedrosian or defendant after leaving the bar, and she did not intend to enter their car. She did not remember leaving the bar. She did not recall anything until the time she woke up at the Motel Sakura at approximately 3:30 a.m. the following day.

When Shirley awoke, she was completely naked. She was sore in between her legs and realized the tampon she had inserted the night before had been removed. There was blood all over the bed. She found her dress, soaking wet, in a trash can. She could not find her underwear or her shoes. She found her purse and her phone under a pillow. She tried to telephone Bedrosian, but his number had been deleted from her phone. She later saw red marks on her wrists and bruises on her legs. Shirley put on her dress and called for a taxi. While waiting for the taxi outside, she saw a police car pass by and waved it down.

Officer Christian Magarino stopped for Shirley and noticed a strong odor of alcohol and vomit emanating from her. Shirley was very upset. She described her meeting with Bedrosian and defendant but could not remember anything else until the time she woke up in a strange place. Shirley took the officer to the motel and pointed out the room. Officer Magarino took Shirley to the police station while other officers investigated the crime scene. Shirley was later taken for a sexual assault exam.

Alex Yoshimoto, who worked at the Motel Sakura, identified a registration form in the name of Tigran Bedrosian. His mother, Emi Yoshimoto, was working at the motel desk on the night of the incident. She testified that a man attempted to rent a room but

3

she could not rent him one because he had no identification.  He left the lobby and another man entered.  He rented room 204, where Shirley had awakened.  He identified himself as Bedrosian.  He rented the room for one night and paid with his credit card.

Glendale Police Department crime scene technicians Emily Schum and Cynthia Ritter collected evidence from room 204.  There appeared to be blood on the bed sheets, on a towel, in the bathtub, and on the toilet seat.  There were two cigarette butts in an ashtray and one on the floor.  Ritter found a pair of boxer shorts and a pair of men's socks.  A woman's undergarment was found underneath one of the sheets that was on the floor.  A comforter, which appeared to have vomit on it, was found outside near the elevator.

Detective Lola Abrahamian investigated the incident and spoke with the victim and the Yoshimotos.  On her way to the room she saw vomit near the elevator doors.  The motel had 16 video surveillance cameras, which showed nearly every angle of the building.  Police obtained a DVD depicting all of the images from the night of the incident.  The footage showed all activity for a period of over seven hours, between 8:30 p.m. through approximately 4:00 a.m.  After viewing the entire video many times, Detective Abrahamian created a shortened version containing the pertinent images, which was played for the jury.

Detective Abrahamian learned there had been a collision between two automobiles at the entrance of the motel on the night of the incident.  She contacted Garnik Sargsyan, who had reported the accident.  Sargsyan confirmed that the license number of the car that had hit him was the same one the police had identified as a rental vehicle from Enterprise.  The detective showed Sargsyan two photographic lineups, and he identified photographs of defendant as the driver of the car and of Bedrosian as the other man who was there.

The motel's video showed the traffic collision between the Dodge Magnum driven by defendant and Sargysan's car as defendant's car entered the motel driveway.  Defendant is then seen speaking with Sargysan.  Bedrosian is seen wrapped in a comforter and standing near the vehicle.  Defendant enters the lobby after Sargysan

4

leaves. When defendant returns, Bedrosian drops the comforter and is seen to be in his underwear. Defendant removes his outer clothing and Bedrosian puts it on. The video later shows Bedrosian enter the lobby wearing defendant's clothing. After he exits the lobby, both men are seen leaning into the vehicle and removing someone from inside. The person is wrapped and covered in a blanket. Both men carry the individual up the stairs to the second floor. They put the individual down on the landing near the elevator where the vomit was found. Bedrosian opens the door to room 204 and defendant follows him into the room. Bedrosian returns to the blanket and picks up the individual. He puts the individual over his shoulder and enters room 204 behind defendant.

The door to room 204 remains closed until Bedrosian steps out for a moment. Defendant also steps out. Later, defendant steps out dressed only in his boxers, without his T-shirt or socks, and smokes a cigarette. Defendant later exits the room fully clothed and drives away. Meanwhile, Bedrosian exits the room wearing only a towel around his waist and stands on the balcony. When defendant returns he hands Bedrosian a bag. They both leave the room at approximately 10:37 p.m. Bedrosian is wearing ill-fitting clothing. They drive away in the Dodge Magnum. No one else enters or leaves room 204 until approximately 3:25 a.m., when Shirley exits the room.

Detective Abrahamian learned that the Dodge Magnum had been rented by Bedrosian. Detective Abrahamian and several other Glendale police officers were waiting at Enterprise on the day the vehicle was to be returned. Kristine Mirzoyan, Bedrosian's sister and defendant's second cousin, dropped off the car. She was accompanied by Lilit Martirosian, defendant's wife.

Ritter processed the Dodge Magnum. Its contents included a pair of women's heels and a room key card from the Motel Sakura. Ritter also collected a DNA sample from defendant.

Julie Lister was a nurse practitioner and member of a sexual assault response team (SART). She performed a SART examination on Shirley and collected samples for later DNA analysis. Lister observed injuries consisting of three bruises along one shin, a bruise on an arm and faint linear red marks on both wrists. In Lister's experience, linear

5

marks on wrists indicated a ligature was used. Shirley complained of tenderness and soreness to her upper inner thighs. Lister did not observe any genital injuries. Lister testified, based on her training and experience, that the majority of sexual assault victims have normal genital exams. There were factors in Shirley's case that contributed to a normal exam: she was 31 years old and had given birth vaginally multiple times, she was menstruating, and she had suffered loss of consciousness.

Christopher Lee conducts DNA analysis for the Los Angeles County Sheriff's Department. He received reference samples of Shirley's blood and defendant's blood. He determined that defendant was included in the DNA found on one of the cigarette butts from room 204. The odds of defendant's DNA profile being a random match to the profile found on the cigarette were one in 123 quintillion. Shirley's vaginal sample contained sperm cells. The profile obtained from those cells included defendant, and the probability of a random match to that profile was one in 7.91 quintillion.

Defendant was eventually located in New York and arrested almost three years after the incident.

**Defense Evidence**

Defendant did not present any evidence on his behalf.

## DISCUSSION

### I. Alleged Ineffective Assistance of Counsel

#### A. Defendant's Argument

Defendant contends his trial attorney, Miguel Rosales, was ineffective by virtue of his stipulation that defendant raped Shirley F. Defendant also complains that Mr. Rosales failed to investigate defendant's mental health issues when they arose at trial.

#### B. Relevant Authority

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, that counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, defendant would have obtained a more favorable result. (*In re Jones* (1996) 13 Cal.4th 552, 561, citing *Strickland v. Washington* (1984) 466 U.S. 668,

6

687 (*Strickland*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.) Under this standard, the defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) A court need not assess the two factors of the inquiry in order. If there is an inadequate showing on either factor, it need not be addressed. (*Strickland*, at p. 697.)

Defendant must overcome presumptions that counsel was effective and that the challenged action might be considered sound trial strategy. (*In re Jones*, *supra*, 13 Cal.4th at p. 561.) In order to prevail on an ineffective assistance of counsel claim on appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. (*People v. Majors* (1998) 18 Cal.4th 385, 403.) We consider counsel's overall performance throughout the case, evaluating it from counsel's perspective at the time of the challenged act or omission and in light of all the circumstances. (*People v. Bolin* (1998) 18 Cal.4th 297, 335.)

"In measuring counsel's performance, the United States Supreme Court has cautioned that judicial scrutiny 'must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.]'" (*In re Andrews* (2002) 28 Cal.4th 1234, 1253.) "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citations.]" (*Id.* at pp. 1253-1254.)

### C. Proceedings Below

The record in this case begins with a *Marsden* motion by defendant.[2] The transcript of the hearing reveals that defendant had no complaints about his attorney but

---

[2]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

rather was dissatisfied about the number of years in the determinate terms the prosecution was offering him.[3] The motion was denied.

When proceedings resumed, Mr. Rosales acknowledged there was not "anything to argue on DNA" and "there's no way out of that one." He was willing to stipulate to identity and to DNA in order to forestall extensive DNA evidence and the prosecution's motion to force defendant to shave his facial hair. At that point, defendant interjected, "I don't agree, your Honor." The court held another *Marsden* hearing.

Defendant told the court he disputed counsel's strategy. He did not wish to concede he was at the motel at the time of the incident, and he refused to agree that he had relations with the victim or was involved in any way. When asked to respond, Mr. Rosales described to the court the contents of the surveillance videos and the defense's own expert's opinion of the DNA analysis, which implicated defendant. To counsel, the goal was to "beat the life count," which was the kidnap for rape charge in count 1. Counsel did not believe he could tell the jury that it was not defendant in the video and that it was not his DNA. He believed that would be tantamount to inviting the jury to convict defendant of the kidnap for rape. Counsel stated he "looked nine days to Sunday" to see if there was any way to attack the DNA analysis, but there was not. The court told defendant that it did not believe the strategy was ineffective at all and denied the *Marsden* motion.

A third *Marsden* hearing was held midtrial after Detective Abrahamian testified. Defendant was unhappy that his attorney told him he would get a life sentence, and he did not understand why. He wanted to ask the court how the matter was going to be resolved. He also complained that he had not seen the videos, and his attorney had not had in-depth discussions with him. The court found that the latter two complaints were the only proper subjects of the motion and asked counsel to respond. Mr. Rosales stated he had not shown defendant the videos, but he had shown him stills from the videos early

---

[3] The People offered defendant concurrent sentences of eight years for the kidnapping charge and six years for the rape charge.

on. He had explained that kidnap for rape carried a life sentence when he was trying to resolve the case, but defendant kept insisting he was not there at all. Mr. Rosales had pleaded with defendant to resolve the case when an offer was made for six years after showing defendant all of the evidence against him, including the DNA analysis. When defendant insisted he was not there, counsel had experts appointed to verify the DNA results, and the experts had found no errors committed by the laboratory at the Sheriff's department. Mr. Rosales was now "trying to beat the life sentence." When asked for his response, defendant stated, "I don't understand, basically. I just don't want to be convicted of the kidnapping or the rape. I was just there to provide assistance." The court did not find there was ineffective representation or irreconcilable differences. On the contrary, defendant was getting what appeared to be very effective representation. The court explained that a life term was the sentence that the kidnapping charge carried.

### D. No Ineffective Assistance

#### 1. Decision to Concede Rape Count

Considering the DNA evidence in conjunction with all of the other evidence in the case, it is highly unlikely the jury would not have found defendant raped Shirley. Therefore, it was reasonable for Mr. Rosales to pursue strategies that involved reduced culpability, such as concentrating on beating the charge with the life sentence, where the evidence was more ambiguous, as opposed to seeking outright acquittal.

It is not ineffective assistance of counsel for counsel to concede obvious weaknesses in the defense case. (*People v. Mayfield* (1993) 5 Cal.4th 142, 177.) "[W]here the evidence of guilt is quite strong, 'it is entirely understandable that trial counsel, given the weight of incriminating evidence, made no sweeping declarations of his client's innocence but instead adopted a more realistic approach, namely, that . . . defendant . . . may have committed [some of the charged crimes] . . . .'" (*People v. Gurule* (2002) 28 Cal.4th 557, 612.) Competent trial tactics may require complete candor before the jury. (*Ibid*.)

The evidence of guilt on the rape charge was strong. Defendant's DNA was found on one of the cigarettes in the motel room and in the sperm from Shirley's vaginal swab.

9

The surveillance video from the motel shows defendant and Bedrosian carrying an obviously unconscious victim from the car to the motel room. They are then seen coming out to the balcony to smoke in various states of undress at different times. It was not ineffective assistance of counsel to concede some degree of guilt and emphasize the evidence that Shirley left the bar with the two men willingly, regardless of what happened later in the room. (*People v. Bolin*, *supra*, 18 Cal.4th 297, 334-335; see *Anderson v. Calderon* (9th Cir. 2000) 232 F.3d 1053, 1089 [no prejudice even though counsel made "risky" but reasonable argument for jury nullification].) It is sometimes the better strategy to admit what cannot credibly be disputed. (See *People v. Samayoa* (1997) 15 Cal.4th 795, 846-847.) Clearly, counsel had few options in light of the evidence, and his considered tactical decision was not unreasonable.

It is easy to second-guess trial tactics after a loss. Defendant complains that the tactic of getting him convicted on the rape charge and obtaining a sentence of approximately six years was questionable in light of the fact that six years was already offered by the prosecution on the rape charge. Defendant omits the fact that Mr. Rosales apparently begged defendant to take that offer, but defendant adamantly refused and insisted first that he was not at the motel, and later that he was only there to provide assistance.

Given the strong presumption that counsel's actions were based on sound trial strategy, even when admitting some degree of guilt (*People v. Freeman* (1994) 8 Cal.4th 450, 498), we do not believe defendant's attorney was ineffective for conceding the rape charge and urging the jury to find he and his coperpetrator did not kidnap Shirley. "[I]f counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, that is the end of the matter; no tenable claim of ineffective assistance would remain." (*Florida v. Nixon* (2004) 543 U.S. 175, 192.) We cannot say defendant would have obtained a more favorable result had his attorney approached the case by attempting to prove defendant's innocence of the rape.

10

## 2. *Mental Health Issues*

Defendant argues that Mr. Rosales should have further investigated defendant's mental condition. The record shows that after Shirley testified, Mr. Rosales told the court that defendant was on psychotropic medications and had said during the recess that he was hearing voices. Defendant wanted to "be medicated" before continuing with the trial. Mr. Rosales said he did not wish to declare a doubt because he did not believe defendant's condition had risen to "that level." Mr. Rosales informed the court that a psychological evaluation had been done before trial and defendant had been found competent to stand trial. The court stated it would recess the case and sign an order for defendant to see a doctor that afternoon.

On the following morning, Mr. Rosales said he had spoken with defendant that morning and defendant was no longer hearing voices. He added that, on behalf of defendant, he had submitted a letter from defendant's wife to the court "indicating psychological problems." When counsel had asked defendant if he understood the proceedings, defendant said he did. Mr. Rosales told the court he had no doubt of defendant's competency, and the trial continued.

Defendant contends Mr. Rosales should have taken more time to conduct a mental evaluation and determine whether he was fit to stand trial. According to defendant, this is especially evident because defendant's wife pointed out the issue to the court. Defendant was prejudiced because it was not clear whether he became competent to stand trial after he indicated he was hearing voices.

A person is incompetent to stand trial "if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) Due process requires a competency hearing only if the court is presented with substantial evidence of incompetence. (*People v. Lawley* (2002) 27 Cal.4th 102, 136.) Evidence is substantial if it raises a reasonable doubt about the defendant's competence. (*Id.* at p. 131.) In the absence of such evidence, a defendant

11

cannot establish prejudice from the failure of his attorney to seek another determination of his competence.

Defendant's conduct revealed no substantial change of circumstances or new evidence casting a serious doubt on the prior finding of competency. (*People v. Jones* (1991) 53 Cal.3d at p. 1115, 1153) It is not reasonably probable that defendant did not continue to be mentally competent after proceedings resumed, since he had presumably received the treatment he requested, he did not claim to be hearing voices, and he had told his attorney that he understood the proceedings. Thus, the record contains no substantial evidence of incompetency, no grounds for Mr. Rosales to declare a doubt, and nothing to suggest a competency hearing would have resulted in defendant being declared incompetent. Indeed, even if an attorney "has doubts about his client's competence but those doubts are not supported by medical reports or substantial evidence, he does not render ineffective assistance by forgoing an evidentiary hearing." (*People v. Garcia* (2008) 159 Cal.App.4th 163, 172 , citing *People v. Hill* (1967) 67 Cal.2d 105.)

Furthermore, a declaration of doubt by counsel alone is not sufficient to trigger a statutory right to a competency hearing, since section 1368 is written in terms of whether a doubt arises in the mind of *the trial judge* and is then confirmed by defense counsel. (see *People v. Garcia*, *supra*, 159 Cal.App.4th at pp. 169-170; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1111-1112 [defendant's claim his trial counsel was ineffective for failing to request a competency hearing failed where record did not demonstrate a substantial doubt as to the defendant's competency, and trial court not compelled to order a hearing based on counsel's opinion].) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . . [¶] . . . [¶] . . . The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra* , 466 U.S. at pp. 693-694; see *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) Given the lack of substantial evidence of incompetence, there is no reasonable probability the outcome would have been different if counsel had declared a doubt as to defendant's competence.

12

### 3. Conclusion

The record reveals that Mr. Rosales acted competently in defending this case. As in *People v. Freeman,* "[t]hat [his] efforts ultimately failed, as do the efforts of many attorneys in many cases, may be explained by the evidence against defendant and the nature of the crimes, and not by any failings on [his] part." (*People v. Freeman*, *supra*, 8 Cal.4th at p. 509.) Defendant has not demonstrated that defense counsel's representation fell below an objective standard of reasonableness, or that there is a reasonable probability that, but for counsel's allegedly deficient performance, the result of the trial would have been different. (*Strickland*, *supra*, 466 U.S. at pp. 686-687.)

## II. Exclusion of Evidence

### A. Defendant's Argument

Defendant contends that the trial court erred by limiting defense counsel's ability to cross-examine Shirley on the subject of her past conduct and habit of drinking alcohol and leaving bars with strange men before blacking out. Likewise, it was error to exclude cross-examination on the nature of Shirley's employment and mental illness. Consequently, defendant argues, he was denied his Sixth and Fifth Amendment right to a fair trial and his rights under article I, section 15 of the California Constitution.

### B. Proceedings Below

Defense counsel filed a motion to admit evidence of sexual conduct of the complaining witness. (Evid. Code, § 782.) Counsel stated that Shirley's ex-husband told police and his coperpetrator's investigator that Shirley had a history of going to bars alone, getting drunk, leaving with strange men, and then having sex with them. This had occurred at least three times.[4] According to counsel, this evidence was relevant to show Shirley was not kidnapped, but rather left voluntarily. The evidence was also relevant to undermine Shirley's credibility.

---

[4] Defense counsel's motion made no mention of Shirley's employment or any history of mental illness.

13

At the hearing on the motion, counsel explained that he did not wish to use this evidence to prove Shirley's consent to sexual intercourse, but rather to show that her pattern of behavior revealed that she left voluntarily and was not kidnapped. Counsel was "simply trying to avoid the life count" and wanted to demonstrate that Shirley left voluntarily with defendant and Bedrosian, and "at some point she became incapacitated on her way to wherever." Counsel argued that the testimony of the bartenders who saw her leave supported the theory that she left voluntarily. Counsel invited the court to give a limiting instruction and inform the jury the evidence should not be used to indicate consent. Counsel later offered to omit the fact that Shirley had sex with the strange men and say only that, according to her husband, she would leave bars with the men, go places with them, and then not remember anything.

The prosecutor argued that defendant's proffer was insufficient in that it was based on hearsay. The prosecutor also believed the marital privilege would come into play. The only way the evidence could be used was for credibility, and it was not necessary for that purpose, since the prosecution planned to concede that Shirley left the bar voluntarily with the two men. The prosecution theory had the kidnapping taking place later—either at Shirley's car or the perpetrators' car or some other place. Finally, the prosecutor argued, the evidence should not be admitted under Evidence Code section 352.

The court found that what Shirley did three times in the past with other men had very little relevance and was unduly prejudicial. The jury might draw an inference that the victim was promiscuous, or it could become biased against her because, while married, she met with men and went out with them when she was intoxicated. This would divert the jury's attention from the issues. Therefore, the evidence was inadmissible under Evidence Code section 352.

Following the court's ruling, the prosecutor clarified that he would not concede that Shirley left *with* the men in the sense that she agreed to go anywhere with them. She merely agreed to walk out because their evening together was done. In other words, she left at the same time they did. Defense counsel asserted that this was different than what he had expected. If the prosecutor insisted that they all left at the same time but not

14

necessarily together, the evidence he wanted to introduce was relevant. Counsel repeated the arguments he had made earlier and stated the proper method would be to have a hearing and have the witnesses, such as Shirley's ex-husband, testify.

After the prosecution summarized Shirley's expected testimony for the court, the court retained its ruling, stating it did not see the relevance of the prior instances nor their probative value. The court stated that the People were not arguing there was any force or involuntariness in their leaving together. Thus, although not relevant, the evidence would entail an undue consumption of time, distraction, and speculation. The court noted that the defense had reframed its motion from a motion under Evidence Code section 782 into one pursuant to Evidence Code section 1105, showing habit and custom, and defense counsel agreed. Defense counsel then suggested he would ask only about Shirley having a pattern of going to bars, drinking and forgetting about the evening. The court stated, "I don't see the relevance of that because the relevance would be to prove what, essentially, is uncontroverted. The—that's why the court initially made the observation that this is an easy call for this court. I don't see this as a relevant issue, and I can see lots of prejudicial problems."

### C. Relevant Authority

All relevant evidence is admissible. (Evid. Code, § 351.) Relevant evidence is all evidence "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) We review the admission and exclusion of evidence on relevance grounds for abuse of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1123.) Evidence Code section 354 provides that a judgment will not be reversed due to the erroneous exclusion of evidence unless the error resulted in a miscarriage of justice.

Relevant evidence may be excluded pursuant to Evidence Code section 352 if the trial court in its discretion concludes "'its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the

15

jury.'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1069.) A trial court's ruling under this section will not be overturned absent an abuse of discretion. (*Id.* at p. 1070.)

Evidence Code section 1105 provides, "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom."

### D. Evidence Properly Excluded

We believe the trial court correctly excluded the evidence under Evidence Code section 1105. The salient characteristic of habit evidence is that it shows a regular and consistent response to a repeated situation. (*People v. Memro* (1985) 38 Cal.3d 658, 681, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2 [habit or custom may be established by evidence of "repeated instances of similar conduct"]; *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926 ["Custom or habit involves a consistent, semiautomatic response to a repeated situation."]; see *People v. McPeters* (1992) 2 Cal.4th 1148, 1166, 1178 [victim's "regular conduct under certain specified conditions" of earmarking cash for specific purposes by putting it in separate envelope constituted "'evidence of repeated instances of similar conduct'" sufficient for the trial court to conclude there was a habit]; *People v. Webb* (1993) 6 Cal.4th 494, 529 [mother's regular observation over six-month time period of victim putting cash in jars and envelopes showed victim's habit of storing money in that manner and was relevant to showing money was present].)

Whether conduct is a habit depends principally on the sufficiency of the sampling and the uniformity of the response. (2 Jefferson, Cal. Evidence Benchbook (4th ed. 2009) § 35.65, p. 852.) There is no fixed rule for determining when the proffered evidence constitutes habit evidence. (*Ibid.*) Jefferson provides the example of evidence of excessive consumption of alcohol, stating that it is often "excluded when offered as proof that the person was intoxicated on a particular occasion because such evidence constitutes character-trait evidence only and does not conform to the definition of a 'habit' for alcohol consumption." (*Ibid.*)

16

In the instant case, the proffer indicated there was insufficient evidence of Shirley's former conduct to establish a habit, and therefore the evidence was not relevant. "The question whether habit evidence is admissible is essentially one of threshold relevancy [citation]; it is addressed to the sound discretion of the trial court." (*People v. McPeters*, *supra*, 2 Cal.4th at p. 1178.)  Three instances of a 31-year-old woman going out and drinking, apparently followed by going somewhere with a strange man and forgetting everything that happened, are simply insufficient to establish the conduct constituted a habit—i.e., a regular or consistent response to a repeated situation.  (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 337 [evidence that on occasions when victim cleaned her apartment she would leave open the top half of her Dutch door was "insufficient to establish any habit or custom"].)  There were too few incidents of Shirley's described conduct to establish habit within the meaning of Evidence Code section 1105.  Moreover, the fact that Shirley drank a great deal of alcohol, left with the two men, and did not remember anything after 6:45 p.m. was not a disputed fact.  (Evid. Code, § 210.)

Even assuming some relevance, the trial court's exclusion of the evidence under Evidence Code section 352 was proper.  The probative value was slight, since, as noted, the circumstances of Shirley leaving the bar were not in dispute. The proffered evidence would do little more than sully the victim, who was married at the time of the alleged former incidents and the mother of five children.  In addition, introduction of the evidence would lead to an undue consumption of time and speculation on the part of the jury.  The trial court did not abuse its discretion.

In any event, any error in excluding the evidence was harmless under any standard.  Although Shirley left the Elephant Bar voluntarily with defendant and Bedrosian, the proffered evidence would not have done anything to show that she later consented to be taken to the motel to have sex with the men.

Finally, we reject defendant's claims that he was denied federal and state constitutional rights. The California Supreme Court has held that "'[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's

17

[constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; see also *People v. Panah* (2005) 35 Cal.4th 395, 483 [a trial court is permitted to curtail cross-examination relating to irrelevant matters and matters falling under section 352]; *People v. Frye* (1998) 18 Cal.4th 894, 946, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421 ["not every restriction on a defendant's desired method of cross-examination is a constitutional violation . . . the trial court retains wide latitude in restricting cross-examination that is . . . confusing of the issues, or of marginal relevance"]; *People v. Jones* (1998) 17 Cal.4th 279, 305.) There was no constitutional violation.

## III. Denial of New Probation Report

### A. *Defendant's Argument*

Defendant contends the trial court erred by not ordering an updated probation report to reflect defendant's conduct since the 2010 report. Defendant points out that California Rules of Court, rule 4.411 states that the court must order an updated report in cases where the sentencing proceedings occur a "significant period of time after [preparation of the original report]." According to defendant, there would have been no prejudice to the parties if the sentencing had been continued and an updated probation report obtained, and defendant's life sentence warranted accuracy in the sentencing proceedings.

### B. *Proceedings Below*

On the day set for sentencing, defense counsel opened the discussion by saying, "We need an updated probation report." The prosecutor pointed out that the defendant had been in custody since the initial report in 2010 and the victim was present and seeking closure. She wished to see the defendant sentenced. When asked, defense counsel said he did not know what a probation report would show. Counsel suggested that the victim testify that day and that sentencing be continued.

18

Defense counsel told the court he could not point to any benefit the defendant might obtain by an updated probation report and wanted it "just to see what he's been up to" while in custody. Counsel then stated that if the prosecution was adamant about proceeding immediately, it was "fine," although he would like to review the 2010 report, which he had not seen, and write a sentencing memorandum. The prosecutor argued that the sentencing was not being "rushed," as defense counsel was asserting, and defense counsel had not notified anyone that he was not ready until that morning. As a result, the victim had come to court.

Defense counsel insisted that the prosecution show it was prejudiced by having the victim speak that day but postponing the sentencing. The prosecutor replied that the prejudice was to the victim, who had come in to see the defendant sentenced. Defense counsel stated that defendant's conduct in jail was relevant to mitigation, but added that if the prosecution wanted to admit that defendant's performance in county jail was stellar, they could proceed.

The court pointed out that it had received no notice of a need for a continuance until that morning. The court determined that it would proceed because it had no information that defendant had done anything to merit an adverse report on his conduct in jail. Therefore, additional time for a new report was not necessary. Counsel replied, "Very well," but insisted that he wanted to continue the matter. The court stated it had already denied that motion because it had not received notice, and any additional information could only cause possible harm to the defendant.

The prosecutor requested consecutive sentences on all determinate counts, to be served consecutively to the life sentence, because they constituted forcible sex crimes. Defense counsel argued for leniency based principally on defendant's lack of a significant criminal record. Counsel recommended the low terms (three years) on counts 3 and 4, to be run consecutively, but running concurrently to the life term. The court selected the high terms in counts 3, 4, and 5 to run concurrently to each other and to the life term.

19

## C. No Abuse of Discretion or Error

As pointed out by defendant, California Rules of court, rule 4.411 (c) does indeed state that the court must order a supplemental report in preparation for sentencing proceedings that occur a significant period of time after preparation of the original report. As the advisory committee comments note, this subsection is based on case law that requires a supplemental report when a defendant is to be resentenced a significant length of time after the original sentencing. The note states, "The rule is not intended to expand on the requirements of those cases." Thus, this rule refers to cases in which a defendant is being resentenced after a period of time, as does all of the authority cited by defendant. (See *People v. Rojas* (1962) 57 Cal.2d 676, 679, 680-681; *People v. Bullock* (1994) 26 Cal.App.4th 985, 986; *People v. Tatlis* (1991) 230 Cal.App.3d 1266, 1268-1269; *People v. Webb* (1986) 186 Cal.App.3d 401, 404; *Van Velzer v. Superior Court* (1984) 152 Ca.App.3d 742, 744.) This is not the case with defendant.

In all of the authority cited by defendant, the conduct of the defendant while in custody was relevant in the new sentencing procedure. Even assuming defendant's behavior while awaiting trial was relevant to his sentence on the charges, the only mitigating fact that the probation report could have shown was defendant's good behavior while in custody—a fact that was assumed by the trial court in any event.

Thus, defendant has shown neither error nor prejudice. Error in failing to obtain a required supplemental probation report is reviewed under the standard of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 182.) The trial court was obliged to sentence defendant to a life term in count 1. Defense counsel asked for six years (the low terms) concurrent to the life term for the other counts, and the trial court imposed eight years (the high terms) concurrent to the life term. The court based its choice on the egregious nature of the crimes against the victim, a factor that a new probation report would not have influenced in any way. Despite the prosecution's lobbying for consecutive sentences, the trial court imposed all sentences concurrently, which even defense counsel had not requested. The court based this on defendant's lack of a criminal record.

20

We conclude the trial court did not abuse its discretion or err in sentencing defendant without a more recent probation report, and defendant has made no showing of a reasonable probability that a new probation report would have resulted in a more favorable sentence.

## IV.  Abstract of Judgment

Respondent correctly points out that the abstract of judgment and the minute order of the sentencing hearing erroneously state that defendant received a midterm sentence in count 5.  Defendant's six-year term in count 5 reflects the high term, which the trial court explicitly chose.  (§ 220, subd. (a)(1).)  Therefore the minute order and the abstract of judgment must be amended.

## DISPOSITION

The judgment is affirmed.  The superior court is directed to amend the minute order of sentencing and the abstract of judgment to reflect that the six-year sentence in count 5 is the high term.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

21