Filed 2/16/22  Bracken v. Equinox Holdings CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SUSAN BRACKEN, | B304083 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC673140) |
| v. | |
| EQUINOX HOLDINGS, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Sotelo, Judge.  Affirmed.

Taylor & Ring, John C. Taylor; Esner, Chang & Boyer, Holly N. Boyer, Shea S. Murphy, Kevin K. Nguyen; Brock & Gonzales, Timothy J. Gonzales and Donald Aaron Brock for Plaintiff and Appellant.

Jackson Lewis, Thomas G. Mackey, Henry L. Sanchez, Dorothy L. Black and Dylan B. Carp for Defendant and Respondent Equinox Holdings, Inc.

Lewis Brisbois Bisgaard & Smith, Lann G. McIntyre, Melissa T. Daugherty, Kerri R. Lutfey and Ashleigh R. Kasper for Defendant and Respondent Merek Mallard.

_____

Susan Bracken, a former Pilates instructor at Equinox Holdings, Inc.'s fitness facility in West Hollywood, sued Equinox and Derek Mallard, a former massage therapist and fellow employee, alleging Mallard had sexually assaulted her during a massage and Equinox had wrongfully terminated her while she was on medical leave following the assault. A jury found in favor of both Mallard and Equinox, concluding in a special verdict that Mallard had not subjected Bracken to unwanted sexually harassing conduct (by a vote of 10 to two) and, although Equinox was aware Bracken suffered a disability that limited her ability to work, Bracken was not able to perform essential job duties with reasonable accommodations for her disability (by a vote of 11 to one).

On appeal Bracken challenges two sets of evidentiary rulings by the trial court. First, she argues the court erred in denying her motion in limine and allowing Mallard and Equinox to introduce evidence concerning the Los Angeles Sheriff's Department's criminal investigation of Mallard's alleged sexual assault of Bracken and the fact Mallard was not arrested or charged with a crime. Second, she contends the court erred in excluding the testimony of other women who had been victims of sexually inappropriate massages by Mallard ("me too" evidence).

Because those evidentiary rulings did not constitute a prejudicial abuse of the trial court's broad discretion, we affirm the judgment. (See *People v. Young* (2019) 7 Cal.5th 905, 931 [appellate court reviews a trial court's decision to admit or exclude evidence for abuse of discretion; a ruling ""will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice""].)

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Bracken's "Trade Services" Relationship with Mallard and the September 3, 2016 Massage*

Bracken became a Pilates instructor at Equinox in West Hollywood in 2014. Mallard had worked as a massage therapist at the West Hollywood club since 2012, specializing in deep tissue sports massage.

Equinox had a policy encouraging employees to trade services with each other. For example, a personal trainer would work with a massage therapist and receive a free massage in return. The two employees could then refer clients to each other based on their personal experiences. Because Bracken was interested in trading services with a massage therapist who specialized in deep tissue sports massages, her manager directed her to Mallard. Mallard massaged Bracken between 25 and 50 times without incident. She referred a number of her clients to him, calling him a great therapist.

Mallard gave Bracken a two-hour massage on Saturday afternoon, September 3, 2016. As described by Bracken in her trial testimony, she undressed, lay on her back on the massage table and placed covering sheets over herself, all as she had done in the past. Mallard, who began by working on Bracken's neck,

3

was rougher and harder than in the past.  Bracken said he was hurting her, and Mallard responded that she was really tense and he needed to work the tension out.

Mallard then began massaging Bracken's breasts toward the nipples.  Bracken thought it strange because Mallard had not previously massaged this area, but she assumed it was because she was tense.  Mallard then rubbed Bracken's nipples, massaging her breasts in a circular pattern.  Bracken questioned Mallard, who said not everyone did this because "not everybody knows what it takes to release the pec muscles."

As the massage continued, Mallard inappropriately touched Bracken in a variety of ways, including moving his finger on the rim of her anus, then digitally penetrating her anus and her vagina, and pushing his erect penis into her hand while gyrating and moaning as he rubbed her vagina.  Bracken described herself as in disbelief, feeling powerless.  She pretended to be sleeping while the assault continued and then feigned waking up.  According to Bracken, Mallard said he had had a crush on her for a long time, explaining he did not give two-hour massages to everyone.  When Mallard left the room, Bracken dressed and left.  Because she wanted to pretend the assault had not occurred, she sent Mallard a thank you text.

2. *Bracken's Reports of Sexual Abuse*

The day after the massage Bracken handwrote a two-page description of the incident, stating Mallard (who she indicated smelled of pot) had touched her vagina during the massage.  That evening Bracken reported the assault to her supervisor (and friend), Shana Klimeczko, explaining that Mallard had rubbed her breasts and vagina during the massage.  According to Bracken, Klimeczko told her there had been other complaints

4

about the nature of Mallard's massages. Klimeczko testified it was Bracken who told her other women had complained, and she (Klimeczko) was unaware of any Equinox employee or member other than Bracken who expressed concerns about a massage by Mallard.

Klimeczko reported the incident to Equinox's assistant general manager, Maureen Rounds. Rounds and Klimeczko called Equinox's human resources department. Emerson Figueroa, Equinox's senior regional director of human resources, began an investigation.

On Tuesday, September 6, 2016, Bracken, with assistance from a friend, prepared a typed description of the massage, described as a "letter to HR." The document stated Mallard had massaged her breasts including her nipples, massaged her vagina and pressed his erect penis into her body and hand.

Also on September 6, 2016 Figueroa called Bracken as he began his investigation of the incident. Bracken told him she did not want to discuss the matter in detail at that time but would provide a written statement. Bracken wrote a five-page letter describing the September 3, 2016 massage and sent it to Figueroa.

Immediately after receiving Bracken's letter Figueroa suspended Mallard. Figueroa called Bracken on September 7, 2016 and told her he had suspended Mallard and would be in contact with her as his investigation progressed. During the call Bracken told Figueroa she was not comfortable returning to work because she was afraid Mallard might confront her in the parking garage. Figueroa testified he offered to arrange for her to be escorted between her car and the club; Bracken testified Figueroa

told her it was not responsible for her safety in the parking structure.

Equinox terminated Mallard's employment on September 9, 2016. Figueroa notified Bracken of the company's action. According to Figueroa, following Mallard's termination, Bracken was unwilling to communicate with him or assist in the investigation of her charges.

3. *The Sheriff's Department's Investigation*

On September 8, 2016 Bracken, accompanied by her boyfriend, reported Mallard's sexual assault to the Los Angeles County Sheriff's Department at the West Hollywood station. The initial report was taken by two patrol deputies. Bracken gave them the five-page description she had prepared and sent to Figueroa. The incident report prepared by the deputies stated Bracken had explained she did not call for help during the massage because she felt frozen and could not move and had not reported the assault the day it happened because she was ashamed, embarrassed and unsure of what to do. The report also indicated Bracken was offered an emergency protective order, which she declined, saying she would inquire about it on her own at a later date.[1]

Bracken's case was assigned to Detective Margarita Parra.[2] On September 19, 2016 Detective Parra spoke with Bracken by

_____

[1] Bracken testified at trial that she had not been offered an emergency protective order by the deputies.

[2] In her written description of the assault Bracken had stated she was not sure whether Mallard had inserted his finger inside her anus, although she stated, "I do not believe that he ever did." Because Bracken had not alleged penetration, the case was not assigned to the special victims bureau.

telephone and asked her to come to the station for Detective Parra to interview her and record her statement, to identify Mallard from a photographic lineup and to make a pretext call to Mallard in which Bracken would attempt to induce him to admit wrongdoing. Bracken told Detective Parra she was uncomfortable with the idea of the pretext call. Detective Parra testified she told Bracken she did not need to make the call, but it was still important for her to come to the station for a recorded statement and identification of Mallard. Bracken made an appointment to come to the station the following day.

Bracken did not keep the appointment. Detective Parra called her, but Bracken did not return the call. A few days later, when Bracken called and spoke to a sergeant about the status of the case, she was informed Detective Parra could not proceed with the investigation unless she could speak with Bracken. A new appointment was scheduled. Bracken again did not keep it. In a phone conversation several days later Bracken, who testified she understood the pretext call was a requirement, again told Detective Parra she was uncomfortable making such a call. According to Detective Parra, she explained the pretext call was not necessary, but it was essential that Bracken come to the station to discuss her allegations and to identify Mallard. A third appointment was scheduled. Bracken yet again failed to keep it. Several follow-up phone calls by Detective Parra to Bracken were unreturned. During this period Detective Parra spoke to Mallard, who denied he had touched Bracken inappropriately. On January 14, 2017 Detective Parra closed the case. Detective Parra testified she closed the case because of Bracken's failure to cooperate, not based on an assessment of Bracken's or Mallard's credibility.

### 4. *Bracken's Medical Leave and Termination*

Based on a note from Bracken's treating psychologist, Dr. Elena Konstat, that Bracken was temporarily totally disabled, Bracken was placed on medical leave starting September 5, 2016. The leave period was extended several times, eventually to June 12, 2017. Bracken did not return to work after her authorized leave expired.

On July 24, 2017 Equinox notified Bracken she would be deemed to have voluntarily resigned if she did not return to work by July 31, 2017. On July 26, 2017 Dr. Konstat emailed Equinox that Bracken was still temporarily totally disabled until August 28, 2017. Dr. Konstat did not indicate that Bracken would be able to return to work at that time. Also on July 26 and again on July 27, 2017 Bracken emailed Equinox that she would like to return to work at some point. She did not provide any estimate as to when she would be able to do so. Equinox terminated Bracken's employment on July 27, 2017.

### 5. *Bracken's Lawsuit*

Bracken (using the pseudonym Jane Doe) sued Mallard and Equinox on August 21, 2017 for sexual harassment in violation of California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). The complaint alleged a second cause of action against both Mallard and Equinox for sexual assault, battery and ratification, and additional causes of action against Equinox for disability discrimination, failure to accommodate, failure to engage in the interactive process, retaliation and failure to investigate and prevent discrimination, harassment and retaliation, all in violation of FEHA, as well as several Labor Code violations and wrongful termination in violation of public policy. During trial Bracken dismissed her causes of action for

assault, retaliation and violations of the Labor Code and subsequently dismissed her claim for punitive damages against Mallard.

### 6. *Motions in Limine*

#### a. *Bracken's motion in limine no. 8*

Bracken moved in limine to exclude evidence that Mallard had not been arrested or criminally charged, arguing the information was not relevant and reference to those facts would be confusing to the jury and unduly prejudicial to Bracken within the meaning of Evidence Code section 352.[3] The trial court deferred ruling on the motion until trial, but ultimately denied it, reasoning Bracken's failure to cooperate with Detective Parra was properly admitted on the issue of Bracken's credibility. The court made clear, however, that the detective would not be permitted to testify regarding her evaluation of the credibility of any witness. And at Bracken's request the court instructed the jury with special jury instruction 10, "You have heard the testimony that Los Angeles County Sheriff Department's criminal investigation into Derek Mallard was closed as a result of Susan Bracken's failure to cooperate with the criminal investigation. [¶] This fact is not to be considered by you in determining whether Derek Mallard sexually harassed Susan Bracken."

#### b. *Equinox's motion in limine no. 4 and Mallard's motion in limine no. 1*

Equinox and Mallard moved in limine to exclude testimony of other incidents of inappropriate massages by Mallard,

---

[3] Statutory references are to this code unless otherwise stated.

contending it would constitute inadmissible propensity evidence under section 1101, subdivision (a), and, even if otherwise admissible as evidence of a common plan or intent within the meaning of section 1101, subdivision (b),[4] would be unduly prejudicial and should be excluded under section 352.

i. *The proffered testimony*

At a pretrial deposition Breeze Giannasio testified her first massage with Mallard was great but he progressively initiated unwanted physical contact. He began deeply massaging her buttocks, spread her "butt cheeks," touched close to her anus and "brushed" her labia during a massage, although she acknowledged he had not massaged or touched her genitalia. She also wondered whether his penis may have brushed against her body. According to Giannasio, it felt as if Mallard was "grooming" her by pushing "the limit a little bit to see if there was a reaction."

Cathleen Waters testified she felt her vagina had been exposed after Mallard moved a body part during a massage and believed Mallard had grazed her breasts and vagina, although she could not be sure about the physical contact. Waters believed Mallard's comments about her body during the massage were inappropriate. Waters subsequently informed an Equinox manager in New York about this "creepy" massage.

---

[4] In her opposition to the motions in limine Bracken argued, in light of Mallard's denial of any inappropriate touching, evidence of other victims was admissible under section 1101, subdivision (b), to show "Mallard had motive and intent to sexually assault women, that he had an opportunity and plan to do so while giving them massages at Defendant's workplace, and that it was not accident or mistake that he abused Plaintiff."

10

Meredith Steele testified that it felt to her like Mallard was testing the boundaries during massages. Because Mallard made comments about her body she believed were inappropriate, she stopped seeing him for massages.

Klimeczko also testified about a questionable massage that had occurred in 2014 when she visited Mallard for a massage involving the adductor muscle on her inner thigh. As Mallard moved higher into Klimeczko's pelvic area, Klimeczko used her hand to block Mallard from getting closer to her vagina and moved Mallard's hand away. Klimeczko left the massage feeling violated and never returned to Mallard for a massage. Klimeczko spoke with a club manager, asking whether what had happened was normal. The manager responded that it sounded normal, stating Mallard "gets really in there," which Klimeczko testified she understood to refer to deep tissue generally.

ii. *The trial court's ruling granting the motions in substantial part*

The trial court granted the motions in part based on sections 1101 and 352. The court ruled Waters and Klimeczko could testify for the limited purpose of showing notice to Equinox of prior complaints about Mallard, but not to determine whether Mallard had assaulted Bracken. Similarly, the court allowed testimony by a former Equinox manager that another employee, Mariah Symphony, reported what may have been inappropriate touching by Mallard for purposes of notice to Equinox. The court excluded the testimony of Steele and Giannasio concerning inappropriate touching and comments.

7. *Trial and Verdict*

During the two-week jury trial Bracken testified in detail concerning Mallard's sexual assault and her response, both

11

during the massage and afterward. She also testified, when she reported the assault to Klimeczko, Klimeczko responded that Mallard had done that before, to Klimeczko and to other employees and clients. Klimeczko, who was still employed by Equinox, disputed aspects of Bracken's testimony and minimized the significance of her own uncomfortable massage with Mallard.

Mallard denied he had done anything inappropriate during the massage and told the jury he had not been arrested or charged with a crime. Detective Parra testified concerning her investigation and Bracken's failure to cooperate. Figueroa testified about his attempts to investigate Bracken's charges and Bracken's limited assistance in that effort.

Defending against Bracken's claims Equinox and Mallard emphasized what they characterized as Bracken's differing accounts of Mallard's inappropriate massage, pointing out that she added increasingly egregious details of the assault with each iteration: Her original handwritten summary referred to Mallard touching her vagina; by the time of trial she testified Mallard digitally penetrated her anus and vagina and gyrated with his erect penis in her hand.

An additional theme of the defense case was that Bracken may have simply imagined that she had been assaulted while in a trance-like state during the massage. Bracken's expert psychologist, Dr. Anthony Reading, admitted during cross-examination that Bracken's test scores raised a concern that she was exaggerating; and Equinox's expert forensic psychologist, who had examined Bracken, testified Bracken was an "unreliable historian."

Dr. Reading also reported Bracken had told him she felt disconnected or dissociated during the massage, as if she were

12

observing it, and Dr. Reading explained Bracken had dissociative experiences as a coping method because of past traumatic events. Dr. Konstat confirmed that Bracken had dissociative experiences, meaning she felt outside her body. Dr. Konstat acknowledged that during dissociative experiences an individual may believe that something that is not real is real. Equinox's expert similarly testified that during the September 3 massage Bracken may have had a hypnopompic or dreamlike episode in which she perceived things happened to her that did not really happen.

The jury returned a special verdict in favor of Mallard and Equinox. As to the FEHA cause of action for sexual harassment, by a vote of 10 to two the jury answered "no" to the first question, "Did Derek Mallard subject Susan Bracken to unwanted harassing conduct?" The form instructed the jury to skip to the questions on disability discrimination. There, by a vote of 11 to one the jury answered "yes" to the question, "Did Equinox know that Susan Bracken had a disability that limited her ability to work?" and "no" (also by a vote of 11 to one) to the question, "Was Susan Bracken able to perform the essential job duties with reasonable accommodation for her disability?" The verdict form instructed the jury to ignore the remaining questions in light of its "no" answers.[5]

---

[5] On appeal Bracken does not separately challenge the judgment in favor of Equinox on her disability and accommodation claims, arguing only, if this court reverses the verdict on her sexual harassment claim, we should also reverse as to those claims because the jury, which declined to find sexual harassment, obviously did not decide Bracken's mental disability had been caused by Mallard's assault. Equinox responds that the cause of Bracken's disability is not significant in light of the finding her disability prevented her from performing essential job

Judgment was entered in favor of Mallard and Equinox on January 6, 2020. Bracken filed a timely notice of appeal.

## DISCUSSION

1. *Standard of Review*

"No evidence is admissible except relevant evidence." (§ 350; see *People v. Melendez* (2016) 2 Cal.5th 1, 23.) Evidence is relevant, including evidence concerning the credibility of a witness, if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210; see *People v. Benavides* (2005) 35 Cal.4th 69, 90 ["[t]he test of relevance is whether the evidence 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive'"].)

An appellate court reviews the trial court's decision to admit or exclude evidence for abuse of discretion (*People v. Dworak* (2021) 11 Cal.5th 881, 895), including a ruling on whether the proffered evidence is relevant. (*People v. Duong* (2020) 10 Cal.5th 36, 64-65; see *People v. Williams* (2008) 43 Cal.4th 584, 634 ["[t]he trial court has considerable discretion in determining the relevance of evidence"]; see also *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317 ["[t]rial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion"].)

Even if evidence is otherwise admissible, the trial court has discretion to exclude it under section 352 "if its probative value is

_____

functions even with reasonable accommodations. Although Equinox appears to have the better argument, we do not decide the issue because we reject Bracken's challenge to the trial court's evidentiary rulings.

14

substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "As a reviewing court, we accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice." (*People v. Dworak, supra*, 11 Cal.5th at pp. 899-900; see *People v. Miles* (2020) 9 Cal.5th 513, 587, 587-588 ["We will not disturb a trial court's exercise of discretion under Evidence Code section 352 *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice"; internal quotation marks omitted].)

A verdict may be set aside or a judgment reversed for the erroneous admission or exclusion of evidence only if the error resulted in a "miscarriage of justice" (Evid. Code, §§ 353, subd. (b) [erroneous admission of evidence], 354 [erroneous exclusion of evidence])—"that is, that a different result would have been probable if the error had not occurred." (*Zuniga v. Alexandria Care Center, LLC* (2021) 67 Cal.App.5th 871, 888; accord, *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1480; see Code Civ. Proc., § 475 ["[n]o judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"].)

15

2. *The Trial Court's Admission of Evidence Concerning the Sheriff's Department's Investigation and the Fact Mallard Was Not Arrested or Charged with a Crime Did Not Constitute a Prejudicial Abuse of Discretion*

Evidence of the actions of the alleged victim of a sexual offense that is arguably inconsistent with the conduct of someone who has been assaulted is relevant to an assessment of the credibility of the charge of abuse.  (See *People v. Brown* (1994) 8 Cal.4th 746, 761 ["when the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact and circumstances surrounding the delayed complaint also may be relevant to the jury's evaluation of the likelihood that the offense did or did not occur"]; *Jennifer K. v. Shane K.* (2020) 47 Cal.App.5th 558, 585 ["[w]hile absence of a prompt complaint is not a reliable indicator that an alleged sexual assault did not occur, the circumstances surrounding a delayed complaint may be relevant in evaluating the likelihood that the assault occurred"]; see generally § 780 ["[e]xcept as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing"].)

Indeed, the relevance, as well as the potential misuse, of evidence of a victim's post-sexual-attack conduct is the lesson of the substantial body of case law approving expert testimony concerning rape trauma syndrome to rehabilitate the credibility of the complaining witness following an argument her behavior after the assault—such as a delay in reporting it—was inconsistent with her claim of having been raped.  (See, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82; *People v.*

16

*Jones* (2013) 57 Cal.4th 899, 945 ["[s]uch psychological evidence . . . may explain why some rape victims delay reporting the crime, or even recant an accusation, and thus 'may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths'"]; CALCRIM No. 1192.)

Here, it was well within the trial court's discretion to find the evidence of Bracken's several days' delay in reporting Mallard's sexual assault to law enforcement, the content of the report to the extent it differed from her initial handwritten summary or her trial testimony (excluding, for example, any claim of digital penetration), her decision not to obtain an emergency protective order although stating she was afraid of Mallard and her subsequent unwillingness to be interviewed by Detective Parra or otherwise cooperate in the criminal investigation was relevant and admissible to assist the jury in its assessment of the credibility of Bracken's allegations. That Detective Parra told Bracken she could not proceed—that the investigation would have to be closed—if Bracken did not come to the station for an interview and to identify Mallard as her assailant reinforced the potential significance of Bracken's decision not to do so.

In permitting evidence concerning the criminal investigation, the trial court properly recognized that Bracken's reluctance to assist Detective Parra could have been attributable to factors unrelated to Bracken's credibility, indicating that Bracken's counsel should "come up with a game plan that might explain and give an understanding of that." Although Bracken's counsel elected not to present expert testimony concerning the

17

reasons an abuse victim may be reluctant to cooperate with law enforcement, he did exactly what the court suggested:  Bracken in her direct testimony explained her concern about the pretext phone call and her belief that, if she was unwilling to make such a call, any further participation in the investigation would be futile.  And Detective Parra testified sexual assault victims often find it difficult to come forward and to talk to law enforcement officers and clearly acknowledged she did not evaluate Bracken's credibility (or Mallard's) and did not close the case because of an assessment whether a sexual assault had actually occurred.

To be sure, Bracken is correct, when viewed in isolation from the reason the criminal investigation was terminated, the fact Mallard was not arrested or charged with a crime was not relevant to an assessment of Bracken's credibility.  But it was not unreasonable—that is, not an abuse of discretion by the trial court—to permit testimony to explain that closing the case meant no charges were filed, underscoring the seriousness of Bracken's decision not to be interviewed.  Moreover, any possible prejudice from this aspect of the evidence was addressed by the court's special instruction that the testimony the criminal investigation was closed as a result of Bracken's failure to cooperate was not to be considered in determining whether Mallard sexually harassed Bracken.  We presume the jury followed the trial court's instructions.  (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803-804 ["[a]bsent some contrary indication in the record, we presume the jury follows its instructions [citations] 'and that its verdict reflects the legal limitations those instructions imposed'"]; see *People v. Yeoman* (2003) 31 Cal.4th 93, 139 ["the presumption that jurors understand and follow instructions [is] '[t]he crucial

18

assumption underlying our constitutional system of trial by jury'"].)

Bracken's discussion of cases holding that lay opinion about the veracity of another's statements is inadmissible (e.g., *People v. Melton* (1988) 44 Cal.3d 713) and that acquittal in a criminal case is not admissible in a civil action to prove the innocence of the accused (e.g., *Gibson v. Gibson* (1971) 15 Cal.App.3d 943) misses the point that it was a permissible inference (if by no means the only reasonable inference) from Bracken's post-massage conduct (changing narratives describing the details of the incident; refusing to be interviewed by law enforcement; declining an emergency protective order) that her charge of sexual abuse was not credible. Similarly misplaced is Bracken's reliance on the Supreme Court's decisions in *People v. Rundle* (2008) 43 Cal.4th 76 and *People v. Babbitt* (1988) 45 Cal.3d 660 affirming trial court rulings excluding evidence because the offering party (a criminal defendant) had failed to establish preliminary facts necessary for the evidence to be relevant (in *Rundle*, that a list of names was a record of the victim's sexual partners; in *Babbitt*, that violent programming had been on television and viewed by the defendant on the night of the murder). Again, although Bracken's conduct certainly did not prove her allegations against Mallard were false, the inference could be drawn from that conduct that they may have been.[6]

---

[6]    Separate from the very different nature of the evidence proffered in *People v. Rundle*, *supra*, 43 Cal.4th 76 and *People v. Babbitt*, *supra*, 45 Cal.3d 660, and the evidence at issue here, Bracken's analysis of *Rundle* and *Babbitt* fails to recognize that a decision to uphold a trial court's exclusion of evidence does not necessarily indicate whether it would have been an abuse of discretion to admit that same evidence. A trial court's discretion

Finally, there is no merit to Bracken's contention the trial court abused its discretion by not excluding evidence of the criminal investigation and its closure due to her lack of cooperation under section 352 because its probative value was substantially outweighed by undue prejudice to Bracken. Of course the evidence was damaging to Bracken's case, but it was not prejudicial in the sense contemplated by section 352: ""Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt."" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 409; accord, *People v. Cortez* (2016) 63 Cal.4th 101, 128-129 ["[E]vidence is subject to exclusion under Evidence Code section 352 on the basis of prejudice only '"when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose"'"].)

*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, discussed at some length by Bracken, illustrates the type of evidence properly excluded for undue prejudice under section 352. The lawsuit concerned a tire manufacturer's liability for plaintiff's severe brain injury caused when a tire on his rented cargo van delaminated and the van rolled over. (*Id.* at p. 1014.) The manufacturer's defense was the accident was caused by plaintiff overloading the vehicle, not a

in ruling on evidence is broad enough for either ruling in many cases to be affirmed on appeal.

defective tire. (*Id.* at p. 1027.) After initially granting a motion in limine, the trial court admitted evidence (over objection) of plaintiff's simultaneous marriage to two women while having an extramarital affair with a third to rebut his counsel's opening statement that plaintiff had been "living the American dream" before the accident and as relevant to issues of credibility and liability. The court of appeal reversed, questioning the relevance of the intimate details of plaintiff's private life to any issue in the case and holding, to the extent arguably relevant to the cause of the accident (the defendant had argued the plaintiff overloaded the van because he needed to make more money to support two families), the evidence should have been excluded as unduly prejudicial under section 352. (*Winfred D.*, at p. 1014.) The evidence, the court reasoned, "permitted Michelin to parade Winfred's illicit, intimate conduct before the jury—smearing his character and inflaming the jury." (*Id.* at p. 1040.)

We certainly agree with the analysis and holding in *Winfred D.* But that case provides no support for Bracken's section 352 challenge to the trial court's evidentiary ruling. The evidence of the criminal investigation, including Bracken's initial interactions with the patrol deputies and Detective Parra, and Detective Parra's testimony regarding her efforts to obtain Bracken's cooperation were not inflammatory and did not reveal unrelated details of Bracken's private life. While Equinox and Mallard did use that evidence to contest Bracken's credibility, they did not seek to sully her character beyond the legitimate confines of credibility evidence. There was no prejudicial abuse of discretion.

3. *The Trial Court's Limitations on Testimony from Other Mallard Massage Clients Did Not Constitute a Prejudicial Abuse of Discretion*

  a. *Evidence Code section 1101 and the rule excluding propensity evidence*

"Evidence Code section 1101, subdivision (a) sets forth the "'strongly entrenched'" rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299; see *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*) [section 1101, subdivision (a), "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion"].) Such evidence is not excluded because it is irrelevant. ""[O]n the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge""" (*Jackson*, at p. 300.)[7]

---

[7] Section 1108 provides, in a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense is not made inadmissible by section 1101 if the evidence is not inadmissible pursuant to section 352. Section 1109 contains similar provisions permitting the introduction of propensity evidence in criminal actions involving charges of domestic violence, elder abuse and child abuse. (See generally *People v. Falsetta* (1999) 21 Cal.4th 903, 916-917 [upholding constitutionality of section 1108 notwithstanding general rule that propensity evidence is unduly prejudicial, emphasizing that trial court's obligation to consider whether to admit the evidence under section 352 ensures admission of uncharged sexual offenses will not result in a fundamentally unfair trial].)

Section 1101, subdivision (b), however, clarifies this rule "'does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition,' such as identity, common plan or intent," provided the charged and uncharged offenses are sufficiently similar to support a rational inference of those facts or of some other fact unrelated to the defendant's propensity to commit the charged offenses. (*People v. Edwards* (2013) 57 Cal.4th 658, 711; accord, *People v. Jones, supra,* 57 Cal.4th at p. 930.)

The degree of similarity necessary to support admissibility under section 1101, subdivision (b), "depends on the purpose for which the evidence was presented." (*People v. Jones* (2011) 51 Cal.4th 346, 371.) The least degree of similarity between the uncharged act and the charged offense is required to support a rational inference of intent; a greater degree of similarity is required for common design or plan; and the greatest degree of similarity is required for identity. (*People v. Rogers* (2013) 57 Cal.4th 296, 326; *People v. Edwards, supra,* 57 Cal.4th at p. 711.)

"In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance."'" (*Ewoldt, supra,* 7 Cal.4th at p. 402; accord, *People v. Carter* (2005) 36 Cal.4th 1114, 1149.) "'[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negate accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act.'" (*Ewoldt,* at p. 402.)

To be admissible to prove a common design or plan, "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403; accord, *People v. Balcom* (1994) 7 Cal.4th 414, 423-424.)

Even if evidence of uncharged misconduct is relevant for a purpose other than the defendant's propensity or disposition, before admitting the evidence the trial court must also find it has probative value that is not substantially outweighed by its potential for undue prejudice under section 352. (*People v. Leon* (2015) 61 Cal.4th 569, 599; *People v. Balcom*, *supra,* 7 Cal.4th at pp. 426-427.)

      b. *The trial court did not abuse its discretion in excluding prior acts testimony to show intent, a common plan or absence of mistake*

      i. *Intent*

Mallard denied he digitally penetrated Bracken's vagina or anus or inappropriately touched her in any other way during the September 3, 2016 massage. He did not contend he may have done so accidentally. The issue as to Bracken's causes of action against Mallard and Equinox for sexual harassment/hostile work environment, therefore, was what happened during the massage, not Mallard's state of mind—that is, whether he intended any unwanted touching that may have occurred.[8] Accordingly, the trial court acted well within its discretion in ruling testimony

---

[8] Using CACI No. 2523 the trial court defined "harassing conduct" as including, but not limited to, "a. [p]hysical harassment, such as unwanted touching, assault, or physical interference with normal work or movement; or [¶] b. [u]nwanted sexual advances."

24

from other Mallard clients was not admissible to establish intent. (See, e.g, *Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2 ["Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it'"]; *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926 ["[D]efendant denied choking or shoving plaintiff. Because the act was not conceded or assumed, defendant's intent was not at issue. Evidence of uncharged acts could not be admitted to prove an irrelevant matter"]; see also *People v. King* (2010) 183 Cal.App.4th 1281, 1301 [*Bowen* "provides a useful illustration of the limitation on the use of evidence of other acts to establish intent"].)

As Bracken argues, courts in employment discrimination cases have frequently held prior instances of similar conduct are admissible to establish intent. For example, in *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, a pregnancy discrimination case upon which Bracken relies, our colleagues in Division Three of this court reversed an order granting summary judgment in favor of an employer, holding that declarations by other employees who were also fired while pregnant were admissible and created a triable issue regarding pretext or discriminatory animus. (*Id.* at p. 767.) In *Johnson* the issue was not whether plaintiff had been fired, but why. Intent or motive—the reason the employer did what it did—was directly at issue.

Similarly, in *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, a gender-based hostile work environment lawsuit, the fact that plaintiff had been subjected to harassing conduct was not in

25

dispute. However, her employer claimed his frequent use of profanity at a loud volume was always directed at situations, not people; it happened in the presence of men as well as women; and he never would have tolerated harassing behavior by anyone in his office, let alone perpetrated it himself. (*Id.* at p. 110.) The court of appeal reversed the judgment in favor of the employer based on the trial court's exclusion of testimony that the employer had harassed other female employees. That testimony, the court held, was relevant to show the employer "harbored a discriminatory intent or bias based on gender." (*Ibid.*) No comparable issue was presented by Bracken's claim that Mallard had sexually assaulted her. (See *People v. Roldan* (2005) 35 Cal.4th 646, 705, disapproved on another ground in *People v. Dolin* (2009) 45 Cal.4th 390, 421, fn. 22 ["[l]ike other circumstantial evidence, admissibility [of evidence the defendant previously committed a similar crime] depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence *vel non* of some other rule requiring exclusion"].)

ii. *Common plan*

As discussed, to be admissible to prove Mallard sexually assaulted Bracken pursuant to a common plan, the prior acts of misconduct must have sufficient features in common with each other and with Bracken's allegations that Mallard sexually assaulted her during the September 3, 2016 massage to support a rational inference Mallard was acting pursuant to a preexisting plan, rather than engaging in a series of similar spontaneous acts of sexual abuse. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 402 ["in establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the

26

results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations'"]; *People v. Carter, supra*, 36 Cal.4th at p. 1147.) Bracken argues the requisite similarity existed, contending "Mallard had a distinct practice of grooming his clients and method of assault."

It would have been within the trial court's discretion to admit the prior acts evidence proffered by Bracken under the common plan exception. However, the trial court's conclusion the proposed testimony did not share sufficient similarities with Bracken's description of her assault to be admissible was also within the court's broad discretion. Not only did the actual sexual assault alleged by Bracken—digital penetration of her vagina and anus and Mallard's gyration of his penis in her hand during the massage—differ from the inappropriate touching described by the other women, but also there was little in the testimony excluded by the court that suggested Mallard's actions were part of a preexisting scheme or design, rather than momentary impulses. As to Mallard's purported grooming of clients, Giannasio testified it felt as if Mallard over the course of several massages was pushing the limits "a bit" to see if there was a reaction. Although Steele also testified it felt to her like Mallard was testing the boundaries during massages, neither she nor the other two women suggested Mallard had engaged in progressively inappropriate physical conduct during a series of massages. (In fact, Klimeczko and Waters only had one massage with Mallard.) And Bracken made no such charge. To the contrary, she testified she had as many as 50 massages with Mallard without incident. That all of the incidents could be described as involving inappropriate conduct by Mallard during a

27

massage at the Equinox facility in West Hollywood is simply too general a description for us to conclude it was "arbitrary, capricious or patently absurd" to rule the excluded evidence indicated a series of instances in which Mallard reacted to the situation as it presented itself to him, rather than the existence of a plan. (See *Bowen v. Ryan*, *supra*, 163 Cal.App.4th at pp. 924-925 [reversing judgment in favor of plaintiff for dental battery and negligence based on trial court's abuse of discretion in admitting evidence of prior acts of misconduct by defendant dentist; that all the occurrences "demonstrated inappropriate physical responses to difficult patients" was "too broad to describe a meaningful plan"].)[9]

*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, on which Bracken primarily relies to support her argument the prior misconduct evidence was admissible to prove Mallard acted pursuant to a common plan, does not suggest a contrary result. In *Andrews*, a civil action for wrongful arrest, assault and battery against the City of San Francisco and several members of its police department, there was no dispute a struggle had occurred when plaintiff was being booked. Plaintiff claimed San Francisco Police Officer Ramirez deliberately threw his jacket on the floor and demanded plaintiff pick it up. Then, while plaintiff was in a bent over position, Ramirez jumped on

---

[9]     We do not doubt, as Bracken argues, that it is reasonably probable the jury would have believed her allegations if it heard testimony that Mallard had engaged in sexually inappropriate touching on prior occasions. But the Legislature has made the policy judgment in sections 1100 and 1108 that this type of propensity evidence, although admissible in a criminal action, is generally inadmissible in civil lawsuits.

28

top of him and repeatedly beat his head against the floor. Ramirez, on the other hand, characterized himself as a patient, polite officer, trying to subdue an inebriated, unruly and profane arrestee. According to Ramirez, plaintiff's jacket fell on the floor accidentally, and it was plaintiff who demanded that Ramirez pick it up. Plaintiff reacted to Ramirez's refusal to do so by taking a swing at him with his fist, forcing Ramirez to wrestle him to the ground to control him. (*Id.* at p. 945.)

Prior to trial the City successfully moved to prevent plaintiff from presenting evidence of six incidents of violent and abusive behavior by Ramirez. (*Andrews v. City and County of San Francisco*, *supra*, 205 Cal.App.3d at p. 942.) The court of appeal reversed the judgment, holding it was error to exclude the evidence of Officer Ramirez's prior violent conduct. (*Id.* at pp. 940-941.) That evidence, the appellate court stated, indicated "Ramirez had a practice of bullying and assaulting other persons under his custody without provocation or apparent reason" *(id.* at p. 945), and was therefore admissible because "Ramirez's intent was a central issue in the case [and he] professed that he was merely attempting to control plaintiff by use of reasonable force under the circumstances." The prior misconduct evidence, the court explained, "would tend to show that the injuries suffered by plaintiff were not the product of efforts to control him, but were inflicted intentionally and with malice." (*Id.* at p. 945.)

Although the *Andrews* court referred to Officer Ramirez's "practice" of assaulting arrestees, the evidence was admitted to show intent and to impeach Ramirez's claim he was patient with individuals in his custody. (*Andrews v. City and County of San Francisco*, *supra*, 205 Cal.App.3d at pp. 945 ["four of the episodes of Ramirez's misconduct toward other suspects in his

custody . . . were relevant and admissible under section 1101, subdivision (b), to prove both intent and absence of mistake or accident during the booking"], 946 ["The issue of Ramirez's patience in handling prisoners was raised by Ramirez himself. By portraying himself as a 'patient' man who has learned to exercise restraint in 'a lot' of bookings both before and after plaintiff's arrest, Ramirez left himself vulnerable to evidence tending to contradict this claim"].)  The court did not hold the evidence was admissible to prove Ramirez, in assaulting plaintiff, had acted pursuant to a common plan or design; and its opinion provides no guidance on that issue.

### iii.  *Absence of accident or mistake*

In *People v. Spector* (2011) 194 Cal.App.4th 1335 (*Spector*) the court of appeal held the trial court at Phillip Spector's trial for the murder of Lana Clarkson had not abused its discretion in admitting testimony by numerous witnesses of violent encounters they had with Spector during which he threatened them with a gun.  (*Id.* at p. 1372.)  Spector's defense claimed Clarkson was responsible for her own gunshot death—that is, she shot herself intentionally or accidentally—and argued evidence of uncharged conduct by a defendant was not properly admitted to prove the conduct (or absence of conduct) of an alleged victim.  The court of appeal rejected the argument, explaining, "[T]he other crimes evidence consisted of seven separate incidents in which Spector committed armed assaults against women in very specific circumstances . . . .  To the extent the circumstances of Clarkson's death were similar to those prior armed assaults, the latter evidence, without any improper reliance on Spector's bad character or propensities, tended to prove the objective improbability that Clarkson had either committed suicide or

killed herself accidentally.  This is because the evidence tended to show, by operation of the doctrine of chances, the unlikelihood that this time it was the woman, not Spector, who reached for a gun." (*Id.* at p. 1380.)

Relying on *Spector*, *supra*, 194 Cal.App.4th 1335 Bracken argues the testimony from other women who had been sexually harassed by Mallard during a massage was relevant and admissible to rebut the defense argument that Bracken had only imagined she had been assaulted on September 3, 2016. Bracken's reliance on *Spector* is unpersuasive for several reasons.

First, we are not entirely convinced evidence of a defendant's prior acts of misconduct, if not otherwise admissible to prove the defendant's intent or actions consistent with a common plan, ise admissible to disprove a defense theory that someone else (the victim or a third party) committed the offense at issue.[10]  Much of the case authority on which the *Spector* court relied for its approval of a "doctrine of chances" analysis of relevance involved prior acts evidence admitted to prove intent or common plan.  For example, *Spector* quoted at length from *People v. Carpenter* (1997) 15 Cal.4th 312, 379, in which the Supreme Court stated, """The reasoning underlying use of an actor's prior acts as circumstantial evidence of that actor's later intent is well explained by Wigmore [citation].  It is based on 'the doctrine of chances—the instinctive recognition of that logical process which

_____

[10]     We are even less certain such evidence of a defendant's prior conduct, if not otherwise admissible, should be allowed to prove a criminal offense or tort happened at all (the corpus delicti), as here, rather than, as in *Spector*, that the defendant was the actor responsible for a wrongful deed that admittedly took place (the actus reus).

eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.  Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.'""''  (*Spector*, *supra*, 194 Cal.App.4th at p. 1380.)  *Spector* also quoted *People v. Steele* (2002) 27 Cal.4th 1230, 1244 in which the Supreme Court explained, "'[T]he doctrine of chances is based on a *combination* of similar events' and it 'teaches that the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous. Specifically, the more often one kills, especially under similar circumstances, the more reasonable the inference the killing was intended and premeditated.'"  (*Spector*, at p. 1380.)  Indeed, *Spector* itself found the evidence of prior similar acts of misconduct admissible on the issue of Spector's motive or state of mind and did not rest its affirmance of the trial court's evidentiary ruling solely on the ground the evidence disproved the defense theory that Clarkson shot herself.  (*Id.* at pp. 1381-1383.)  Absent an alternate ground for admitting it, using evidence of a defendant's prior acts to prove the crime was not committed by someone else (that is, to prove it is unlikely defendant did not commit the crime given what he or she has previously done) seems perilously close to permitting propensity evidence.

Second, as *Spector* explained, to be admissible for any proper purpose under the doctrine of chances, including proof of the absence of accident or mistake, the prior acts of misconduct must be sufficiently similar to the charged misconduct to be "logically relevant"—that is, the prior acts must reasonably support the inference asserted by the proponent of the evidence. (See *Spector*, *supra*, 194 Cal.App.4th at p. 1377; see also *id.* at p. 1388 ["The inculpatory inferences raised here were based on a far more specific foundation than the mere proposition Spector hates women and tends to assault them with guns. Rather, the evidence showed Spector had a history of committing armed assaults against women in very particular circumstances. The evidence showed that, when fueled by alcohol and faced with a lack or loss of control over a woman who was alone with him and in whom he had a romantic or sexual interest, Spector underwent a sharp mood swing, exhibited extreme anger, and threatened the woman with a gun when she refused to do his bidding"].) In the language used by the Supreme Court in *People v. Carpenter*, *supra*, 15 Cal.4th at page 379, there must be multiple "similar instances" with "similar results." That threshold evaluation of similarity necessarily rests within the trial court's broad discretion, as it does when the court evaluates any other argument that evidence of prior misconduct comes within section 1101, subdivision (b).

In addition, as discussed, even when the evidence of uncharged misconduct is relevant to an issue other than the defendant's propensity to commit the charged offense, the trial court may exclude the evidence based on an evaluation under section 352 that its probative value would be outweighed by the danger of undue prejudice. (See *Ewoldt*, *supra*, 7 Cal.4th at

p. 404; *Spector, supra*, 194 Cal.App.4th at p. 1387.) That decision, too, is committed to the discretion of the trial court.

For the reasons discussed, the prior acts of misconduct proffered by Bracken were sufficiently dissimilar to the acts of sexual abuse at issue in the case that it was not an abuse of the trial court's discretion to conclude the evidence was not relevant. Alternatively, the court could properly rule its probative value was substantially outweighed by its prejudicial effects when offered to rebut the defense argument that Bracken had imagined the assault during a hypnopompic or dreamlike episode.

### c. *The prior acts evidence was not admissible to impeach Mallard's credibility*

On recross-examination of Mallard (called as a witness during Bracken's case-in-chief pursuant to section 776), the following exchange took place:

"Q [Bracken's counsel] Have you ever improperly touched a client's breasts during a massage?

"A [Mallard] Never.

"Q Have you ever inappropriately touched a woman at or near her vaginal area during a massage?

"A Never.

"Q And the various people who made complaints about you that you heard about during the course of the trial, they're all making it up?

"A That's right."[11]

---

[11] Immediately before this series of three questions, counsel for Mallard objected, "[v]iolates the court order," when Bracken's counsel asked Mallard whether he ever learned that any Equinox member had complained about his massages. The court cautioned, "If you're making reference to the complaints that

On appeal Bracken argues Mallard's denials of inappropriate touching made the excluded prior acts testimony admissible to impeach Mallard's credibility pursuant to section 1101, subdivision (c), which excepts from subdivision (a)'s general rule "evidence offered to support or attack the credibility of a witness." (See, e.g., *Pantoja v. Anton, supra*, 198 Cal.App.4th at p. 118 [evidence of defendant's prior acts of harassing women was admissible not only to rebut his theory that he had a practice of engaging in profane tirades without bias and a policy of not tolerating harassment but also to impeach his testimony about his intent, policy and practice]; *Andrews v. City and County of San Francisco, supra*, 205 Cal.App.3d at p. 946 [evidence of officer's prior episodes of violence involving suspects in his custody was admissible to impeach the credibility of his claim he was a patient officer who had learned to exercise restraint during bookings].)[12]

---

have already been identified on direct or cross, that's fine. But nothing beyond that, counsel." No objection was made to the subsequent questions eliciting Mallard's denials of improper touching.

[12]    In her opposition to the motions in limine Bracken included an argument that the prior acts testimony was relevant to impeach Mallard's denial he had abused any women. Bracken, however, has not provided any record citation indicating she asked the court to reconsider its in limine ruling after Mallard's testimony on recross-examination. (See generally *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2018) 19 Cal.App.5th 789, 796-797 [reviewing court may treat argument as forfeited when appellant fails to provide record citation supporting its contention].)

Had Mallard in his direct testimony made such unequivocal denials of inappropriate touching, Bracken's argument regarding the relevance of the prior acts evidence to impeach his credibility would be well-taken, subject nonetheless to the trial court's discretion to exclude the evidence under section 352. However, given the trial court's previous ruling that the evidence was inadmissible, Bracken was not entitled to cross-examine (or recross-examine) Mallard for the purpose of eliciting a response that would permit her to use the excluded evidence for purposes of impeachment. (See *People v. Gurule* (2002) 28 Cal.4th 557, 619 ["a party cannot ask a witness a question in order to later impeach him"]; *People v. Lavergne* (1971) 4 Cal.3d 735, 744 [same].)

## DISPOSITION

The judgment is affirmed. Mallard and Equinox are to recover their costs on appeal.


                                        PERLUSS, P. J.
We concur:



        FEUER, J.



        WISE, J.*

---

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.