[No. C051930. Third Dist. June 5, 2008.]

D'MICHAEL BOWEN, a Minor, etc., et al., Plaintiffs and Respondents, v. DONALD RYAN, Defendant and Appellant.

COUNSEL

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen, C. Athena Roussos; Law Offices of Robert B. Zaro, Robert Zaro and Stephen L. Ramazzini for Defendant and Appellant.

Law Office of Johnson & Johnson, Peter Johnson and Kelly Jenkins for Plaintiffs and Respondents.

OPINION

HULL, J.—Defendant Donald Ryan is a dentist whose patients include difficult-to-treat children with behavior problems. This case began with a claim by plaintiff D'Michael Bowen that defendant choked him and shoved him against a wall during a dental appointment. It continued with a trial that included 13 witnesses testifying about nine different unrelated incidents in which defendant allegedly hit, restrained, or otherwise mistreated child patients. The trial ended with a nine-to-three special verdict awarding plaintiff $90,000 in damages. No punitive damages were awarded because the jury found no malice.

On appeal, defendant contends that the court erred in admitting the evidence of unrelated incidents. We agree, and reverse the judgment. For the guidance of the court in the event of retrial, we briefly address defendant's remaining claims concerning the proper scope of an expert witness's testimony.

FACTS AND PROCEEDINGS

Defendant had been in practice for approximately 28 years and estimated he had seen 35,000 to 45,000 patients during that time, including 8,000 to 10,000 patients in the preceding five years. The vast majority of his patients were children, some of whom had been referred by other dentists because they were difficult to treat.

Plaintiff's complaint alleged causes of action against defendant for assault, battery, and professional negligence. These claims were based on events that occurred when plaintiff went to defendant's office for dental treatment. Plaintiff alleged that defendant choked him, restrained him, slammed him against a wall, and threatened him with harm. This incident occurred in 2002, and trial took place in 2005. The evidence at trial was as follows:

In the summer of 2002, when plaintiff was eight years old, plaintiff developed an infected tooth. His mother took him to a dentist, but plaintiff refused to cooperate and would not open his mouth. The dentist prescribed antibiotics and suggested that plaintiff see another dentist.

Plaintiff took the antibiotics and his condition temporarily improved. When the pain returned and plaintiff's face became swollen, plaintiff's mother called defendant's office and asked if they could see plaintiff that day. The office made an immediate appointment.

After completing some paperwork, plaintiff's mother accompanied plaintiff into the operatory but she was soon asked to wait in the reception area. She complied, leaving defendant, his assistant, and plaintiff in the operatory.

Defendant planned to do a pulpectomy (a procedure similar to a root canal) and he applied a topical anesthetic preparatory to giving plaintiff an injection to numb the area around the problem tooth. It is at this point that plaintiff's version of events and defendant's diverge.

According to plaintiff, he began to cry when he saw defendant take a syringe from the counter. Plaintiff said that he did not want a shot, and cried "no, no, no" over and over. When the needle was about 12 inches from his face, he began kicking his feet and he put his arms above his stomach. Defendant then placed his arm on the right side of defendant's neck and pushed hard, making it impossible for plaintiff to breathe. At trial, plaintiff said defendant held his arm against plaintiff's neck for 60 seconds; in his deposition, plaintiff had estimated that this lasted three to four seconds. Plaintiff testified that defendant let go when his assistant told him to stop.

Upon being released from this hold, plaintiff said he had to use the bathroom. Plaintiff went down the hall by himself to the bathroom and returned. When he came back into the operatory, defendant slammed him against a wall and held him there, angrily asking if there was going to be a problem and if plaintiff would let defendant work on his teeth. Plaintiff was scared, but said he would cooperate. Plaintiff climbed back onto the dental chair, and defendant completed the planned treatment.

Defendant offered a very different version of events. He said that, as he approached the injection site with the unsheathed syringe, plaintiff turned his head and saw the shot. The needle was about four inches from plaintiff's face. Plaintiff began kicking and grabbed defendant's wrist with both of his hands. Defendant was concerned that the needle would hurt plaintiff, the dental assistant or himself, and he put his forearm on defendant's chest in order to stabilize the syringe. Defendant repeatedly told plaintiff to let go of his arm.

Plaintiff asked to go to the bathroom, and the dental assistant told defendant to let him go. Defendant replied that he would let him go as soon as plaintiff released his arm. Plaintiff did so, and got out of the chair.

Defendant motioned plaintiff over and stopped him by the entryway by putting his hand on plaintiff's chest. He did not push him, but instead spoke to him firmly, explaining that his job was to fix plaintiff's teeth, and that they could either be fixed here or at the hospital. He told plaintiff that there could be no kicking or grabbing, and plaintiff said that he understood. Plaintiff went to the bathroom, returned to the operatory, and apologized to defendant. Plaintiff climbed back into the dental chair and defendant continued the procedure without further incident.

Defendant denied ever putting his arm against, or touching, plaintiff's neck, and he denied shoving plaintiff into the wall.

Defendant's dental assistant corroborated defendant's testimony. She testified that, when the syringe was three to four inches from plaintiff's mouth, plaintiff screamed and began to kick hard. Plaintiff grabbed defendant's arm and defendant put his own arm on plaintiff's midsternum to stabilize his hand. She never saw defendant's arm on plaintiff's throat, and plaintiff never said that, he could not breathe. She estimated the entire episode lasted four to five seconds. She did not see or hear defendant push or shove plaintiff. She said plaintiff was calm when he returned from the bathroom, apologized to defendant, and was cooperative through the remainder of the procedure.

The dental receptionist heard plaintiff crying in the bathroom, but did not hear plaintiff say anything in the operatory. She did not hear him say anything to his mother after the appointment about being choked.

Another office worker testified on behalf of plaintiff. She said that, while she was working in the office lab, she heard defendant's voice sounding very loud. She also heard plaintiff say "no, no, no." She heard plaintiff ask to use the bathroom and, after a few minutes, saw defendant push his chair back, throw his arms up and say, "Fine. Go." She said that she saw defendant grab plaintiff near the collarbone and neck and physically shove him against the doorframe. Defendant told him in a very loud voice that this behavior would not be tolerated in his office. Plaintiff had a shocked look on his face, but proceeded to the bathroom.

The employee was very upset by what she had witnessed, and later called plaintiff's mother, ostensibly to see how plaintiff was doing after his dental procedure. When plaintiff's mother said that plaintiff had told her that he had been choked, the employee told her what she had witnessed.

Much of the testimony at trial related to appropriate and inappropriate behavior modification techniques used by pediatric dentists. These included descriptions of restraints such as a papoose board, in which a child is put on a rigid board with hands tied down, and a hand-over-mouth technique used to quiet children. None of these techniques were alleged to have been used on plaintiff. Testimony also described voice modulation techniques and the use of volume and tone to communicate with children. Plaintiff offered an expert witness to explain proper behavior modification techniques, and argued that defendant did not use these methods appropriately.

Before trial began, plaintiff disclosed that he intended to call numerous witnesses to describe plaintiff's treatment of other children. Defendant sought to exclude this evidence as improper character evidence under Evidence Code section 1101 (unspecified section references that follow are to the Evidence Code), but the trial court denied the motion, finding that the evidence was relevant to demonstrating a common plan or design.

At trial, 13 witnesses described nine different incidents, as follows:

Incident 1: A.G. and his mother testified that defendant treated A.G. in 2000, when A.G. was four and one-half years old. A.G. said that he was standing on the chair and crying when defendant ordered him to sit down and be quiet. When he did not comply, defendant slapped him on both sides of his face, causing him to bleed under his nose. A.G.'s mother said she heard defendant yelling at her son. When she went into the operatory to see what was happening, she saw two assistants holding her son's legs, and defendant holding him down by the shoulder.

Incident 2: G.V. testified that defendant treated her in 2000, when she was nine years old. She thought she had been tied down for her treatment. At

some point, her gum was cut and she asked to rinse out her mouth. Defendant told her she could not. As G.V. cried, defendant told her to shut up, and put his hand over her mouth so that she could not breathe.

Incident 3: M.O. and her mother testified about treatment she received in 1993, when M.O. was four years old. M.O. remembered that she had been strapped down and that defendant hit her. She bit defendant at some point during the procedure. Her mother testified that she heard her daughter screaming during the appointment, and that M.O was still crying when the appointment was over. M.O. had a handprint on her face.

Incident 4: C.L. took her four-year-old daughter to see defendant in 2001. She heard her daughter scream and then saw her crying hysterically and running toward the reception counter. Defendant grabbed her daughter by the arms and started to lift her, saying, "Stop that. Don't do that here." The entire incident was extremely brief, lasting at most two seconds.

Incident 5: T.C. testified that she took her three-year-old son to defendant in 2002. When her son cried, defendant put his hand over the child's mouth and pushed up against his nose, and told him to "shut up."

Incident 6: In 1996, L.V. took her four-year-old son to see defendant. She heard her son screaming in the examining room and heard defendant yelling at him. Her son was crying when he came out of the room and his face had a handprint as if he had been slapped. Her son later told her that defendant had slapped him on both cheeks.

Incident 7: E.M.'s four-year-old son, S., was defendant's patient in 2002. When S. cried, defendant yelled at him, telling him that he could not move from the chair. Defendant had E.M. return with S. later that day. When they came back, defendant dragged S. into the operatory. E.M. heard crying for about five minutes. Defendant did not complete treatment on S. because S. would not let him. When S. came out to the reception area, he had marks on his face and he later said that the doctor had hit him with his hand.

Incident 8: A.R. and her mother testified about a visit to defendant in 2000, when A.R. was four years old. A.R. remembered only that defendant was "mean." Her mother said she heard her daughter crying during the examination, and A.R. told her afterwards that defendant had hit her on the leg.

Incident 9: J.M. and his mother testified about an incident that occurred in 1993 when J.M. was nine years old. J.M. said that when he told defendant that he had to spit during his treatment, defendant held his face and jabbed him with his fist. J.M. bit his tongue and began to bleed.

Many of these witnesses also testified that they reported defendant to the dental board or law enforcement. In response, defendant explained his treatment of these patients, and his dental assistants also testified about these incidents. Defendant offered patient witnesses of his own, each of whom testified that defendant provided appropriate care.

A special verdict form was submitted to the jury outlining three causes of action: negligence, dental battery, and battery.

The jury deliberated over several days and ultimately returned a nine-to-three verdict in favor of plaintiff. It awarded $10,000 for negligent treatment, $10,000 for dental battery, and $70,000 for battery. However, the jury also concluded, by a nine-to-three vote, that defendant did not act with malice.

Defendant appeals.

DISCUSSION

I

*Evidence of Other Incidents*

The trial court concluded that the testimony of other patients about unrelated treatment by defendant was admissible under section 1101 to establish a common design. Defendant contends that this ruling was erroneous and necessitates reversal. We agree.

Section 1101, subdivision (a) provides that, subject to limited exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

As the Law Revision Commission explains, "Section 1101 excludes evidence of character to prove conduct in a civil case for the following reasons. *First,* character evidence is of slight probative value and may be very prejudicial. *Second,* character evidence tends to distract the trier of fact from the main question of what actually happened on the particular occasion and permits the trier of fact to reward the good man and to punish the bad man because of their respective characters. *Third,* introduction of character evidence may result in confusion of issues and require extended collateral inquiry." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 1101, p. 438.)

■ Therefore, pursuant to section 1101, "evidence that a person is a competent or skilled [professional] (or the inverse), whether proven by reputation, opinion or specific acts, is not admissible to prove the defendant was negligent on a particular occasion." (*Hinson v. Clairemont Community Hospital* (1990) 218 Cal.App.3d 1110, 1120 [267 Cal.Rptr. 503], disapproved on other grounds in *Alexander v. Superior Court* (1993) 5 Cal.4th 1218, 1228, fn. 10 [23 Cal.Rptr.2d 397, 859 P.2d 96].) A trial centers on a specific incident, not the defendant's general behavior. " ' "A doctor's reputation for skill and ability will not exonerate him, where gross negligence and want of the application of skill is alleged and proved. Nor can the fact that a doctor is reputed to be negligent or unskillful be allowed as proof to establish negligence or unskillful treatment in a particular case, because he may have treated that case with unusual skill and care." ' [Citations.]" (*Hinson, supra,* at p. 1121.) For that reason, evidence of a defendant's prior negligence in medical treatment is inadmissible to prove negligence in a particular. (*Id.* at p. 1122; see also § 1104 ["evidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion"].)

However, this evidence may be admissible for other reasons. Section 1101, subdivision (b) provides, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act."

Plaintiff asserted, and the trial court agreed, that testimony from other patients was admissible under this provision to establish that defendant acted pursuant to a common plan or design, that is, that he engaged in the conduct alleged by plaintiff. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 394 [27 Cal.Rptr.2d 646, 867 P.2d 757].) We disagree.

■ To establish a common design or plan, "evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.]" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) "[T]he common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [I]t need only exist to support the inference that the defendant employed that plan in committing the charged [act]." (*Id.* at p. 403.)

■ The evidence presented here did not demonstrate the existence of a common plan. Defendant was accused of putting his arm against plaintiff's

throat when giving him an injection and then later shoving plaintiff against a wall. None of the witnesses described similar treatment. Some said they were hit, some said they were restrained, some said that defendant employed a hand-over-mouth technique. Neither the context of these other incidents nor the acts complained of shared the requisite common features with the incident plaintiff alleged to have happened.

Plaintiff contends that all of these occurrences demonstrated inappropriate physical responses to difficult patients. But plaintiff's description is too broad to describe a meaningful plan. The acts themselves varied, unlike the typical common plan case. For example, in *Ewoldt*, the defendant molested two girls by committing the same acts under similar circumstances. (*People v. Ewoldt, supra*, 7 Cal.4th at p. 403.) Here, however, witnesses described physical contact that did not replicate that charged by plaintiff. And the setting for whatever contact occurred was different: none of these witnesses were getting an injection when defendant allegedly mistreated them, and no safety issues were implicated by anyone's testimony.

Moreover, defendant testified that he treated as many as 45,000 patients in his lengthy career. Testimony about nine incidents is highly selective and cannot be considered representative. The testimony does not demonstrate activities occurring as part of a common design or plan. Rather, this evidence demonstrated a character trait, precisely the type of use that section 1101 prohibits.

Plaintiff suggests that this evidence was nonetheless admissible to demonstrate intent. We disagree.

Initially, we note that although plaintiff briefly alluded to intent as a basis for admission, the trial court did not base its decision on such grounds. Instead, the court adopted plaintiff's principal argument and ruled that the incidents were sufficiently similar to qualify as a common plan or design.

More importantly, plaintiff is wrong on the law: this evidence was not admissible to establish intent because intent was not at issue. In comparing the use of evidence of uncharged acts to establish common plan versus intent, the California Supreme Court explained, "Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense. 'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' [Citation.] . . . [¶] Evidence of common design or plan is admissible to establish that the defendant committed the *act* alleged. Unlike evidence used to prove intent, where the act is conceded or assumed, '[i]n proving design, the act is still undetermined . . . .' [Citation.]" (*People v. Ewoldt, supra*, 7 Cal.4th at p. 394, fn. 2.)

In the present case, plaintiff contended that defendant put his arm against his neck and choked him, and then shoved him against a wall. Had defendant conceded doing these acts but sought to defend them as occurring by accident or otherwise, evidence of uncharged acts might have been admissible to establish his intent. (See, e.g., *Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 945 [252 Cal.Rptr. 716] [police officer and suspect agreed physical confrontation occurred but each claimed the other was the aggressor].) But that is not the case. Instead, defendant denied choking or shoving plaintiff. Because the act was not conceded or assumed, defendant's intent was not at issue. Evidence of uncharged acts could not be admitted to prove an irrelevant matter.

Plaintiff contends that the challenged evidence was admissible to attack defendant's credibility. (§ 1101, subd. (c); see, e.g., *People v. Millwee* (1998) 18 Cal.4th 96, 130–131 [74 Cal.Rptr.2d 418, 954 P.2d 990].) However, plaintiff never sought to introduce this evidence for such a purpose, and the evidence was not admitted under that theory.

█ Plaintiff asserts that the uncharged acts were admissible under section 1105 to demonstrate that defendant acted in accordance with his usual custom or habit. This statute provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." This statute is inapplicable to the present case. Custom or habit involves a consistent, semiautomatic response to a repeated situation. (*People v. Memro* (1985) 38 Cal.3d 658, 681, fn. 22 [214 Cal.Rptr. 832, 700 P.2d 446]; *Webb v. Van Noort* (1966) 239 Cal.App.2d 472, 478 [48 Cal.Rptr. 823].) For the reasons we have already explained, defendant's conduct, occurring in different circumstances, toward nine of some 45,000 patients, does not qualify as custom or habit. Improper character evidence does not become admissible simply by citing to section 1105 and claiming actions in accordance with a custom or habit. The evidence introduced here did not relate to custom or habit; it was instead plain and simple character evidence, and inadmissible.

Finally, even if we were to conclude that the proffered evidence was proper under section 1101, we would nonetheless conclude that the trial court abused its discretion under section 352 in permitting the testimony of these former patients. (See *People v. Ewoldt, supra,* 7 Cal.4th at pp. 404–405.) Plaintiff presented the testimony of 13 witnesses to describe defendant's treatment of other problem patients. These incidents, some occurring as many as 11 years earlier, involved different circumstances and different conduct on the part of defendant. While plaintiff contends they all demonstrated inappropriate treatment of patients, that descriptive rubric is far too broad to be of much probative value. None of the incidents involved an attempt to give a child an

injection, and none involved the physical acts of choking and shoving alleged by plaintiff. Many of them involved behavior modification techniques that were absent from this case. The evidence was time-consuming and essentially led to a series of minitrials over each incident, with testimony not only from the patients and/or their parents, but also from defendant and his assistants. It deflected the jury's attention from the central issues of the case, namely, defendant's treatment of this particular plaintiff and the credibility of the witnesses to this event.

The probative value of this other-acts evidence was slight, but it had great potential for prejudice, confusion, and consumption of time. The evidence tended to evoke an emotional bias against defendant that clouded the relevant issues in the case. (See *People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) The trial court abused its discretion under section 352 in admitting this evidence.

The error in admitting evidence describing uncharged acts requires reversal. We need not belabor the points already made. This case was not a disciplinary proceeding. It was a tort case, involving two specific instances of allegedly tortious conduct by defendant committed against one patient during the course of one dental appointment. The witnesses to this incident offered sharply different views of what transpired. Plaintiff asserted that defendant held his arm against his neck, choked him, and later shoved him against a wall. Defendant denied those acts, and instead testified that, when plaintiff grabbed defendant's arm in an attempt to avoid receiving an injection, defendant put his forearm on plaintiff's chest to stabilize his hand and prevent anyone from being injured by the hypodermic needle. He denied shoving plaintiff against a wall and said he put his hand on plaintiff's chest only to caution him about his behavior. One office assistant testified in favor of plaintiff, while the assistant who helped treat plaintiff testified in favor of defendant. Thirteen other witnesses described defendant's abusive treatment of children in the past.

This was a close case—even with the testimony that we have decided was erroneously admitted—as evidenced by the length of the jury's deliberations (see *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [184 Cal.Rptr. 165, 647 P.2d 569]), its nine-to-three verdict, and its finding that defendant did not act with malice. Had the evidence of other acts not been admitted, it is reasonably probable that the jury would have returned a different verdict. (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105 [87 Cal.Rptr.2d 754]; *People v. Allen* (1978) 77 Cal.App.3d 924, 935 [144 Cal.Rptr. 6].) The judgment must therefore be reversed.

## II

### *Expert Witness Testimony**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed. Defendant is awarded his costs on appeal.

Davis, Acting P. J., and Morrison, J., concurred.

---

*See footnote, *ante*, page 916.