Filed 4/8/25  P. v. Koehl CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRIAN SCOTT KOEHL,<br><br>    Defendant and Appellant. | D083299<br><br><br><br>(Super. Ct. No. SCD295304) |


APPEAL from a judgment of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed as modified.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina, Christine Levingston Bergman and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Brian Scott Koehl of one count of second degree murder (Pen. Code,[1] § 187, subd. (a)) with a true finding on a weapon enhancement (§ 12022, subd. (b)). The trial court sentenced Koehl to prison for an indeterminate term of 15 years to life and a one-year determinate term.

Koehl contends that (1) the trial court improperly excluded proposed witness testimony about the man Koehl killed; and (2) the trial court erred in declining to instruct on involuntary manslaughter as a lesser included offense. As we will explain, the arguments lack merit.

Koehl also contends, and the People agree, that the trial court made certain errors in imposing fines and fees. Those contentions have merit.

We accordingly modify the judgment to correct the errors regarding the fines and fees. As modified, we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves a conviction for a killing that occurred in 1990. Koehl was identified as a suspect and then charged with murder in 2022 due to advances in forensic DNA analysis.

In 1990, at age 19, Koehl was newly enlisted in the United States Navy and was briefly stationed in the San Diego area while he trained to become a diver at a Naval base in Coronado. During that time, Koehl developed a friendship with 31-year-old Larry Joe Breen, who was also in the Navy. Breen worked as a cook on the USS Fox in San Diego but lived in an apartment off the ship.

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

Breen was killed at his apartment in May 1990 with two stab wounds to his neck. The physical evidence established that Breen was first stabbed on the left side of his neck while inside his apartment. That first stab wound was three inches deep and cut Breen's internal and external jugular veins. The injury would have caused death within a few minutes due to the loss of blood. While Breen was bleeding profusely from that wound, he and his assailant apparently engaged in a physical struggle inside the apartment, leaving an extensive trail of blood.

Breen then went through a window, breaking its glass, and ended up outside in a fenced yard. While in the yard, Breen was stabbed for a second time, on the front of his neck. The second wound was two to three inches deep. It resulted in Breen's death within seconds, as it cut completely through Breen's trachea and esophagus, and also cut a vein and an artery. Breen's body was found completely nude, covered with blood, mud and grass, and slumped up against a fence in the corner of the yard.

The murder went unsolved for more than three decades. Eventually, a detective in the cold case homicide division of the San Diego Police Department identified Koehl as a suspect. Koehl's DNA was found to match DNA at the murder scene, and Koehl was arrested in 2022. Koehl was charged with murder (§ 187, subd. (a)), and it was alleged that he used a deadly or dangerous weapon (§ 12022, subd. (b)).

At trial, Koehl's close friend from high school (Friend) testified that in 1992 Koehl told him that he had killed someone. Friend testified, "[Koehl] told me that he went to a Navy buddy's house and they were watching TV, drinking beers. The guy came out naked and made an advance on [Koehl]. [Koehl] wrestled him down, grabbed the knife and stabbed him to death." According to Friend, the exact words that Koehl used were, " 'The little faggot

3

came on to me.' " Friend further testified, "[Koehl] said that after he stabbed him to death and he made sure he was dead, . . . then he wiped up all the fingerprints where he touched at in this place." Koehl did not mention anything about being in fear for his life or acting in self-defense, and he did not state that the victim had a weapon.

Koehl testified in his own defense at trial. Koehl admitted that he had stabbed and killed Breen. However, he stated that Breen had threatened him with a knife and that he had acted in self-defense.

Specifically, according to Koehl, after spending time with Breen on two previous occasions, he went to Breen's new unfurnished apartment, where the two men drank beers and talked. By that time, Koehl had started to wonder whether Breen was gay, but Koehl had rejected the idea because homosexuality was not allowed in the military at the time.

According to Koehl, after an hour or two, Breen went into the bathroom to take a shower while Koehl sat down on a comforter on the floor, drank more beer and fell asleep. When Koehl woke up, he was nude and Breen, who was also nude, was orally copulating him. According to Koehl, after he pushed Breen off and got to his feet, he tried to leave out of the front door, but Breen tackled him and then blocked the door while holding a knife and stating, "You're not leaving." Koehl testified that when he saw the knife, he felt Breen was going to kill him, so he grabbed Breen's wrist to get control of the knife. The two men struggled over the knife, but Koehl was able to gain control and stabbed Breen in the neck.

The fight continued because Breen still would not let Koehl leave and was trying to regain control of the knife. At some point, Koehl and Breen fell through and broke a window while still grappling with each other. After both men got back onto their feet outside, Breen continued to fight and reach for

the knife. According to Koehl, he felt that he had to "end the attack" that Breen was making toward him and therefore stabbed Breen again. Koehl stated, "I just remember at the very end, the final stab, I just remember, again, with everything I had, I had to end the attack on me and the attack of him trying to get the knife. And that last stab, he quit attacking me." According to Koehl, he did not want to kill Breen; he only wanted to prevent Breen from killing him. Koehl fled from the scene and did not report the incident.

In closing argument, defense counsel argued that the jury should conclude that Koehl acted in self-defense and find him not guilty. The jury rejected that argument, along with instructions on imperfect self-defense (CALCRIM No. 571), and convicted Koehl of second degree murder, along with making a true finding on the weapon enhancement. The trial court sentenced Koehl to prison for a term of 15 years to life for the murder conviction, plus a one-year term for the weapon enhancement.

## II.

## DISCUSSION

A.    *Koehl's Challenge to the Trial Court's Ruling Excluding the Testimony of Paul M.*

We first consider Koehl's contention that the trial court prejudicially erred by excluding the proffered testimony of Paul M.

In a hearing held pursuant to Evidence Code section 402, Paul M. explained that he worked with Breen on the USS Fox for a few months up until the time of Breen's death. Although Breen did not live on the ship, he spent free time after work on a daily basis in its living quarters. According to Paul M., it was well known among the sailors in the living quarters that Breen was gay because Breen was "very open about his sexuality," "wasn't

5

shy about his personal likings" and "kind of wore 'em on his sleeve all the time."

As Paul M. explained, after showering Breen would, on a daily basis, walk around for more than an hour at a time while nude from the waist down and often with an erect penis. While doing so, Breen made "persistent" sexual advances to other sailors. Breen would comment on other men's bodies and would sometimes touch another man's buttocks or rub up against someone, including with his erect penis. While engaging in this behavior, Breen was normally smiling and pleasant, and he often giggled. Paul M. stated that although Breen's advances were "persistent," Breen was not physically aggressive. Specifically, the prosecutor asked, "So he was not aggressive toward you; correct?" Paul M. replied, "No, he didn't try to kick my ass, if that's what you're saying. He wasn't aggressive as in physically aggressive. That's not -- it wasn't his style."

Koehl argued in the trial court that Paul M.'s testimony was admissible pursuant to Evidence Code section 1103, subdivision (a)(1) to prove "conduct of the victim in conformity with the character or trait of character." Specifically, Koehl contended that Paul M.'s testimony would establish Breen's character for "aggressive homosexual behavior."

Alternatively, Koehl argued that Paul M.'s testimony was admissible pursuant to Evidence Code section 1105, which states that "[a]ny otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." (Evid. Code, § 1105.) With respect to Evidence Code section 1105, Koehl contended that Breen's practice of being "naked from the waist down on a daily basis" and his practice of "mak[ing] comments about other sailor's 'anatomy,' and

6

'giggl[ing]' " constituted a "habit" within the meaning of Evidence Code section 1105.

The trial court excluded Paul M.'s testimony, concluding that neither Evidence Code 1103 nor Evidence Code 1105 applied.  Further the trial court ruled that even if either of those provisions did apply, it would exclude Paul M.'s testimony pursuant to Evidence Code section 352.

On appeal, Koehl does not rely on Evidence Code section 1103 to argue that the trial court erred in excluding Paul M.'s testimony.  Instead, Koehl relies solely upon Evidence Code 1105, arguing that Paul M.'s testimony was admissible because it constituted evidence of habit.[2]  Koehl also argues that, assuming Paul M.'s testimony constitutes admissible evidence of habit, the trial court erred in excluding the evidence under Evidence Code section 352.  We review the court's evidentiary rulings for abuse of discretion.  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

---

[2]    In his appellate briefing, Koehl is inexact in discussing the evidence that he believes should have been admitted as evidence of habit pursuant to Evidence Code section 1105.  For example, he describes the relevant evidence as "testimony recounting Breen's homosexual advances," evidence "that Breen had made unwanted sexual advances on others," and "[e]vidence that Breen sexually assaulted others."  In his reply brief, Koehl goes even further astray, focusing on Paul M.'s testimony that "Breen would intentionally brush his erect penis on [Paul M.'s] front side and that he would touch another young sailor's buttocks and cuddle up to him."  None of that testimony was sought to be admitted at trial as evidence of habit pursuant to Evidence Code section 1105.  Accordingly, the trial court's ruling excluding that evidence is not at issue in this appeal, which Koehl has directed *solely* at the trial court's rejection of the request that certain aspects of Paul M.'s testimony be admitted as habit evidence pursuant to Evidence Code section 1105.

As used in Evidence Code section 1105 " ' " [h]abit' means a person's regular or consistent response to a repeated situation. 'Custom' means the routine practice or behavior on the part of a group or organization that is equivalent to the habit of an individual." ' " (*People v. Johnson* (2019) 8 Cal.5th 475, 518.)

There can be a fine line between evidence of habit and evidence of character. (See *U.S. v. Yazzie* (10th Cir. 1999) 188 F.3d 1178, 1190; *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926 (*Bowen*).) We need not, and do not, decide whether Breen's practice of walking around naked in the military living quarters while commenting on other sailors' anatomy and giggling is properly described as a "habit" within the meaning of Evidence Code section 1105 rather than evidence of Breen's character. As we will explain, assuming, without deciding, that the evidence describes a "habit," the trial court properly excluded it pursuant to Evidence Code section 352.

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In applying Evidence Code section 352, the trial court observed that the habit evidence proffered by Koehl had "absolutely no relevance to the homicide," and therefore concluded that there was no probative value to outweigh the other factors in the analysis. Koehl takes issue with that conclusion. He argues that the habit evidence was highly relevant because it would have "partially corroborated his story and assisted the jury in assessing [his] credibility," and that by its ruling, the trial court "deprived the jury of key evidence that would have helped it assess [Koehl's] credibility."

8

We are not persuaded. The evidence that Koehl sought to admit under Evidence Code section 1105 would have established that Breen regularly (1) walked around naked from the waist down, and (2) commented on other sailors' anatomy and giggled. It is a stretch to conclude that Breen's habitual behavior in military living quarters was relevant to how he would have acted in his own home when a friend was present. However, even assuming such relevance, the habit evidence was still not probative of Koehl's credibility for two reasons.

First, Breen's habit of commenting on other sailors' anatomy and giggling would not have corroborated Koehl's story because Koehl did not testify that Breen ever commented on his anatomy or giggled.[3] According to Koehl, he did not experience any unusual behavior from Breen until he woke up to find Breen orally copulating him. Second, Breen's habit of walking around naked would not have corroborated any disputed part of Koehl's story. Based on the physical evidence at the murder scene, including Breen's nude blood-covered body, there was never any dispute that Breen must have

---

[3] The evidence that Breen commented on other sailors' anatomy and giggled might have served to support an inference that Breen was gay. However, defense counsel did not advocate at trial for the admission of Paul M.'s testimony on that basis. As the People correctly point out, other evidence at trial already supported an inference that Breen was gay. Further, while discussing a different evidentiary issue during trial, the trial court expressly stated that it was *not* excluding evidence of Breen's homosexuality. Had defense counsel sought to admit Paul M.'s testimony as evidence that Breen was gay, the trial court would have evaluated whether some or all of Paul M.'s testimony was appropriate for admission on that basis. However, because defense counsel did not make that argument in the trial court, Koehl cannot, for the first time on appeal, argue that Paul M.'s testimony should have been admitted as evidence that Breen was gay. (Evid. Code, § 354, subd. (a); *People v. Fauber* (1992) 2 Cal.4th 792, 831.)

been naked during the altercation. Therefore, Paul M.'s testimony that Breen walked around naked after showering was not needed to lend credibility to Koehl's testimony that Breen was nude during the events leading up to the murder. Breen's nudity was already well established. In sum, no aspect of the habit evidence proffered through Paul M.'s testimony had any probative value in supporting Koehl's credibility.

Turning to the second part of the analysis under Evidence Code section 352, the trial court reasonably concluded that introduction of Paul M.'s testimony would unduly consume time at trial, raise the danger of undue prejudice and confuse the issues. Apart from consuming time and focusing the jury on tangential issues, the admission of the habit evidence raised a significant danger of undue prejudice. Specifically, "[i]mproper character evidence does not become admissible simply by citing to [Evidence Code] section 1105 and claiming actions in accordance with a custom or habit." (*Bowen, supra,* 163 Cal.App.4th at p. 926). Although the trial court concluded that Paul M.'s testimony was not admissible as evidence of Breen's character, had that testimony been admitted as evidence of habit, there was a danger that the jury would impermissibly use the testimony to draw conclusions about Breen's character.

Accordingly, because the trial court reasonably concluded that the habit evidence proffered by Koehl through Paul M.'s testimony lacked relevance to the issues presented at trial, and admission of the evidence would "necessitate undue consumption of time" or "create substantial danger of undue prejudice [or] of confusing the issues" (Evid. Code, § 352), the trial

court did not abuse its discretion in excluding the evidence pursuant to Evidence Code section 352.[4]

B.  *The Trial Court Did Not Err in Declining to Instruct on Involuntary Manslaughter*

The next issue is whether the trial court erred in rejecting Koehl's request that the jury be instructed pursuant to CALCRIM No. 580 with the lesser included offense of involuntary manslaughter (§ 192, subd (b)).

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, . . . ' . . . . That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' . . . 'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' . . . [¶] . . . 'This substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak,' " but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." . . . "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." ' " (*People v. Souza* (2012) 54 Cal.4th 90, 115–116, citations omitted.)

---

[4]  Koehl contends that the trial court's exclusion of Paul M.'s testimony also violated his constitutional right to due process. Having found no merit to Koehl's argument based on evidentiary rules, we also reject the contention regarding constitutional error. Moreover, in general, "the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution." (*People v. Marks* (2003) 31 Cal.4th 197, 227.)

As we understand Koehl's argument, the theory of involuntary manslaughter he contends was warranted by the evidence in this case is described in *People v. Brothers* (2015) 236 Cal.App.4th 24 (*Brothers*). *Brothers* held that "an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony." (*Id.* at pp. 33–34.) "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Importantly, under *Brothers*, "when . . . the defendant indisputably *has* deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, thus satisfying the objective component of implied malice as a matter of law, and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no . . . duty to instruct on involuntary manslaughter." (*Brothers*, p. 35, italics added.)

Koehl argues that because he "testified that [he] did not intend to kill Breen during the fatal assault" and because "Breen suffered but two stab wounds only one of which caused instantaneous death," the evidence would have supported a jury finding that he acted without malice, supporting an involuntary manslaughter instruction. As we will explain, the argument lacks merit because the evidence presented at trial supports no other reasonable finding than that Koehl engaged in "a type of aggravated assault the natural consequences of which are dangerous to human life" and that he "subjectively appreciated the danger to human life his conduct posed and

12

acted with a conscious disregard for life." (*Brothers*, *supra*, 236 Cal.App.4th at p. 35)

As for whether Koehl's deliberate act of twice stabbing Breen in the neck was objectively dangerous to human life (*Brothers*, *supra*, 236 Cal.App.4th at p. 35), Koehl has identified no evidence that would support a contrary conclusion. The medical examiner described the large deep wounds in Breen's neck and the extensive tissue damage that resulted. The first wound was fatal within minutes; the second wound was fatal within seconds. Koehl euphemistically describes the injury he inflicted as "but two stab wounds." However, he overlooks that because those wounds were deep and were to Breen's neck, infliction of the wounds was, without any reasonable doubt, an act that was objectively dangerous to human life.

As to whether Koehl subjectively appreciated the danger to human life posed by his attack on Breen (*Brothers*, *supra*, 236 Cal.App.4th at p. 35), although Koehl testified he did not intend to *kill* Breen, Koehl did not testify that he lacked appreciation for the grave injury that the stab wounds would cause, or that he stabbed Breen by mistake. Instead, Koehl testified that he intentionally inflicted the first stab wound by indiscriminately aiming for Breen's upper body, and he inflicted the second stab wound because he wanted to "end the attack." Further, even if Koehl was somehow subjectively unaware of the serious bodily injury a deep stab wound to the neck would cause, by the time Koehl inflicted the *second* stab wound, he had already witnessed the catastrophic consequences of the first stab wound, which caused large amounts of blood to flow from Breen's neck and be deposited throughout the crime scene. No reasonable juror could conclude that, at the time of the second stab wound, Koehl was subjectively unaware that a stab wound to the neck is dangerous to human life.

13

Moreover, this is not a situation, as in *People v. Vasquez* (2018) 30 Cal.App.5th 786, 796, which Koehl cites, where the victim had a medical condition, unknown to the defendant, which caused a beating that would not normally be life threatening to become fatal. The act of inflicting deep stab wounds to a person's neck is a life-threatening act when performed on anyone, regardless of the person's medical condition. Accordingly, the evidence supports no other reasonable conclusion than that Koehl was aware of the danger to human life posed by his attack on Breen.

In short, regardless of whether Koehl intended to kill Breen, Koehl's own description of the incident, along with the indisputably dangerous nature of the two deep stab wounds that Koehl inflicted on Breen's neck, permit no other finding than that Koehl "deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life" and "subjectively appreciated the danger to human life his . . . conduct posed." (*Brothers*, *supra*, 236 Cal.App.4th at p. 35.) Accordingly, the trial court properly rejected Koehl's request to instruct on involuntary manslaughter.[5]

C.    *Errors in the Imposition of Fines and Fees*

Koehl has identified two errors that the trial court made in imposing fines and fees at sentencing.

1.    *Parole Revocation Restitution Fine*

The trial court imposed a parole revocation restitution fine in the amount of $10,000, which it suspended unless parole was revoked. (§ 1202.45, subd. (a).) Koehl contends, and the People agree, that imposition

---

[5]    Because we find no error in denial of the request to instruct on involuntary manslaughter, we also reject Koehl's contention that the error violated his constitutional right to due process.

of that fine violates the ex post facto clause of the federal and state constitutions.  (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)

The provision under which the fine was imposed, section 1202.45, became effective in 1995 (Stats. 1995, ch. 313 § 6), which was five years *after* Koehl committed the murder in 1990.  "[T]he ex post facto clause forbids imposing a parole revocation fine on a parolee who committed the underlying crime prior to the enactment of the fine."  (*People v. Callejas* (2000) 85 Cal.App.4th 667, 678; see also *People v. Flores* (2009) 176 Cal.App.4th 1171, 1182.)  The fine was therefore improperly imposed.

We will accordingly order that the judgment be modified to strike the $10,000 parole revocation restitution fine imposed pursuant to section 1202.45, subdivision (a).

2.      *Court Security Fee and Criminal Conviction Assessment Fee*

The trial court imposed a court security fee (§ 1465.8) in the amount of $160, and it imposed a criminal conviction assessment fee (Gov. Code, § 70373) in the amount of $120.  Koehl contends, and the People agree, that the amount of those fees was in excess of what is statutorily authorized.

Section 1465.8, subdivision (a) states, "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense . . . ."  Government Code section 70373, subdivision (a)(1) states, "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction for a criminal offense . . . . The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony . . . ."  Koehl argues that because he was convicted of only a *single* count, the fee pursuant to section 1465.8 should have been $40, instead of $160, and the fee pursuant to Government Code section 70373 should have been $30, instead of $160.  The argument has

15

merit based on the plain statutory language and the fact that Koehl was convicted of only a single count.

We will therefore order that the amount of the court security fee (§ 1465.8) be modified to $40, and the amount of the criminal conviction assessment fee (Gov. Code, § 70373) be modified to $30.

## DISPOSITION

The judgment is modified to (1) strike the $10,000 parole revocation restitution fine imposed pursuant to section 1202.45; (2) modify the court security fee imposed pursuant to section 1465.8 to the amount of $40; and (3) modify the criminal conviction assessment fee imposed pursuant to Government Code section 70373 to the amount of $30. As modified, the judgment is affirmed.

The trial court is directed to prepare an amended abstract of judgment reflecting the modification of the fines and fees, which it shall forward to the Department of Corrections and Rehabilitation.


IRION, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.


16